## GEORGE D. EMERY *vs.* BOSTON MARINE INSURANCE COMPANY.

Suffolk.    March 6, 7, 1884. — Jan. 10, 1885.    COLBURN, J., absent.

Evidence of a usage to require a written application for marine insurance is incompetent for the purpose of meeting evidence on the part of the plaintiff tending to prove an oral contract of insurance.

An open policy of marine insurance contained the clause, " no risk to be binding until accepted by the company and indorsed herein." *Held,* that this did not preclude the insurer from afterwards orally accepting a new risk, subject to the other provisions of the policy, with an agreement to put it in writing thereafter by indorsing it upon the policy.

The by-laws of a marine insurance company provided that the president should receive applications for insurance, fix the rates of premium, and sign all policies; that, in the absence of the president, policies should be signed by two directors; and that the secretary should countersign all policies. In an action against the company on an alleged oral contract to indorse a risk upon an open policy of insurance, made by the secretary in the absence of the president, there was evidence that the president had signed policies in blank and had left the secretary to make the contract; that the secretary had made such indorsements in the absence of the president; that the secretary had never been forbidden to do so; that the president did not think the business of the company stopped when he was away; that the directors did not pretend to have much to do with the business; and that no instance was remembered where the president had revoked a policy issued or risk taken by the secretary in his absence. *Held,* that the jury might infer from this evidence that the secretary had the requisite authority to make a binding oral agreement to enter an indorsement upon the policy.

In an action on an alleged oral agreement to indorse a risk upon an open policy of marine insurance, the plaintiff testified that he said to the secretary of the insurance company, that he had seen a clerk of the company a few days before and told him to enter up a certain sum on a certain cargo, and had said that he would bring in the open policy and have it entered up when the invoice arrived, and that the secretary said, " All right." *Held,* that the jury would be warranted in finding from this evidence a waiver of a condition in the policy that no risk was to be binding until indorsed on the policy.

An oral contract of insurance on cargo was alleged to be made, by the terms of which the insured was to bring in to the insurer the invoice of the cargo on its arrival, and have the risk indorsed on an open policy of insurance. The invoice arrived on September 9, and was not taken to the insurer. On September 12, when the loss of the vessel carrying the cargo was reported, the insured demanded that the indorsement be made on the policy. The insurer refused, on the ground that he had made no such contract. *Held,* that it was for the jury to determine whether the delay was a reasonable one. *Held, also,* that the ground of refusal would render a subsequent presentation of the invoice unnecessary.

CONTRACT.  The declaration alleged that the defendant made to the plaintiff an open policy of insurance, a copy of which

was annexed; that, afterwards, to wit, on or about August 4, 1882, and September 5, 1882, the defendant insured the plaintiff under said policy, against the perils therein mentioned, on the cargo of the barque Bridgeport, then being laden at New Orleans, consisting of hard wood, to wit, black-walnut, ash, and cypress, in the sum of $10,000, on a voyage from New Orleans to Boston, which risk the defendant accepted and agreed to indorse upon said open policy; that the vessel set sail from New Orleans on or about September 6, 1882, and was afterwards totally lost, with her cargo, by perils of the seas; that the cargo belonged to the plaintiff, and in value exceeded $10,000. The declaration further alleged notice to the defendant, and a demand and refusal to pay.

The copy of the policy annexed insured the plaintiff, "on mahogany and or other hard woods, free from claim for damage, but liable for a total loss of a part if amounting to five per cent, on board vessel or vessels at and from Cuba and or New Orleans to Boston. . . . . No risk to be binding until accepted by the company and indorsed herein. . . . . Beginning this insurance upon the said property hereby insured, from and immediately following the loading thereof on board the said vessel, and so shall continue during the voyage aforesaid and until landed." The policy enumerated the perils insured against, including those of the seas; and stated the rate of premium to be two per cent. On the second and third pages of the policy were printed headings, as follows: "Date. Certificate. Name of Vessel. Property Insured. Amount. Rate. Premium. Valuation. From. To. Remarks."

Answer, a general denial.

Trial in this court, before *W. Allen*, J., who allowed a bill of exceptions, in substance as follows:

The plaintiff testified that the open policy was delivered to him soon after February 14, 1882; that, on March 18 following, he had an interview with Ransom B. Fuller, the president of the defendant company, at which the plaintiff requested that insurance on the freight and cargo of the barque Bridgeport, for a voyage from Santa Cruz to Boston, be indorsed on the policy; that Fuller then made, or caused to be made, the indorsements which appear on the policy, except the values, which were put

on later, after the plaintiff received the invoices of the cargo, and after the voyage began. These indorsements were under date of March 18, 1882; and the valuation was stated to be " Invoice and 10%."

The witness further testified, that, at some time from the 24th to the 27th of March, he asked Fuller if he wanted the cargoes of the Bridgeport, to which Fuller replied, " We will take them; " that the Bridgeport, after completing the voyage from Santa Cruz, arrived at New Orleans, on July 25 following, where she was loaded with walnut and ash, and a few cypress logs, for Boston, which constituted the cargo for the loss of which this action was brought; and that, while she was being loaded, he informed Fuller that the Bridgeport was being loaded, and he would soon have a cargo for her; that on Saturday, August 26, 1882, he went into the office of the defendant company; that Fuller and Lord (the secretary of the company) were not there, but Elmer Littlefield was; that " I told Littlefield that the Bridgeport was nearly loaded, and that I wanted him to enter up $10,000 on the cargo of the Bridgeport; " that the witness further said he would bring in the invoice when it arrived and get the exact amount, and bring in the open policy and have it entered therein; that Littlefield said, " All right; " that, on September 4, he went again to the office of the defendant, saw Lord, the secretary, and told him that he had spoken to Littlefield a few days before, and told him to enter up $10,000 on the cargo of the Bridgeport, and had said that he would bring in the open policy and have it entered up when the invoice arrived; that Lord said, " All right; " that he also spoke to him in regard to substituting the mate for the captain on the Bridgeport, and the effect it would have on the insurance; that while in St. Louis, about September 12, he saw a report of the loss of the Bridgeport, and sent the following telegram to his son: " Take over immediately open policy of Boston Marine Insurance Company, and have entered $10,000 on cargo of Bridgeport, which they entered upon their books before I left, walnut and ash logs. If they object take down what they say; " — and that he received the following answer from his son: " Marine Company claim have no such record as you telegraph."

On cross-examination, the witness testified that he did not understand that Fuller was bound to take all the cargoes of the Bridgeport, but only such as should thereafter be agreed upon; that at the time of taking out the policy and when the indorsements of March 18 were made thereon, he made applications in writing for the insurance on the risks then covered; that he did not know that the defendant and the other Boston companies had always exacted a written application for insurance; that the insurances for which his written applications were made were effected with the president; that he never received any bill for the premium on the insurance on the lost cargo of the Bridgeport; that in telling them to enter up $10,000 on the cargo of the Bridgeport he said he would bring in the open policy, and have it entered up when the invoice arrived; that the invoice arrived on September 9, during his absence in St. Louis, but was not brought to the defendant, as he did not suppose there was anybody to attend to the invoice until he came back; that after his return the invoice was not brought to the defendant, for the reason that they had contended on September 12 that they had no insurance on the lost cargo.

The plaintiff put in evidence the deposition of Herbert C. Emery, his son, who testified in substance that on September 12, on receipt of the telegram from his father, he went to the defendant's office with the plaintiff's policy, and saw Fuller, the president, and requested him to "indorse upon the said policy the $10,000 which they had entered on their books;" that Fuller looked at the policy, and said there was no such entry on their books; that the witness showed him said telegram, and Fuller replied that he knew nothing about it, and that Fuller also said he saw by that morning's paper that the Bridgeport was lost.

It was agreed that preliminary proof and notice of loss were made on January 6, 1883, and that no question was made of the competency or seamanship of the mate who was substituted for the captain on the Bridgeport's last voyage. The Bridgeport sailed from New Orleans on September 6, 1882, with the cargo in question on board, and was never heard from, and no question was made that there was a total loss of vessel and cargo.

It was in evidence, and not disputed, that the whole of the lost cargo was of the value of $10,173.55, of which a portion, of

the value of $1153.56, was on deck, the value of the remainder
being $9019.99.

Ransom B. Fuller, president of the defendant company, testi-
fied, as a witness for the defence, that he had been in the insur-
ance business fifteen or seventeen years, and had been connected
with the defendant company since its organization in 1873.

The by-laws of the defendant company were then offered by
the defendant, and admitted against the plaintiff's objection.
By § 3, the officers of the company consisted of a president and
secretary, and not less than seven directors. The president and
secretary were chosen by the directors, who also appointed such
other officers as they deemed expedient. Section 9 provided
that "the president shall receive applications for insurance;
fix the rates of premium and the sums to be taken; sign all
policies, and adjust and pay all losses, except in cases where he
may require the opinion of the board of directors. . . . . In case
of the absence, inability, or death of the president, policies and
other papers shall be signed by two directors." Section 10 pre-
scribed that the secretary shall "countersign all policies."

On cross-examination, the president testified, in answer to the
question, "When you are absent from the office, who attends to
the business of the company?" that parties wanting insurance
would naturally apply to Lord, "and risks that he takes I approve;
but I am not obliged to unless I am a mind to;" that Lord had
taken risks in his absence, subject to his approval; that Lord
had been in the habit of issuing policies in the absence of the
witness; that he sometimes signed policies in blank, and left
them with the secretary, but it was not his custom to do so;
that he could not tell how often he had done it; that the next
officer to himself was the vice-president, who was in New York;
that the next was the secretary; that he should think it prob-
able that the secretary had received applications in his absence,
and had made indorsements upon open policies, though he could
not remember any particular case; that he believed it had been
done; that he presumed people had been in and had indorse-
ments when he had been away; that he had never forbidden
the secretary to do so; that no one, so far as he knew, had for-
bidden it; that he had known of the practice all through the
time the company had been in existence; that the directors were

in the habit of dropping in at the office, but did not pretend to have much to do about the business, "except we asked their advice sometimes;" that he did not think the business of the company stopped when he was gone; and that he did not intend that it should.

Samuel S. Allen, a witness for the defence, testified that his business was marine insurance; that he had been in that business twenty-five years, and was familiar with the customs and usages of the business in Boston.  He was then asked by counsel for the defendant "whether there is any usage as to the matter of making written applications for marine insurance."  The court excluded the question.

Elmer Littlefield, a witness for the defendant, testified that he was a clerk of the defendant, and that he had a conversation with the plaintiff at the company's office in the latter part of August, at the time mentioned by the plaintiff, after office hours, in relation to a reduction in rate on a cargo of lumber; that "we had telephoned him, or Fuller had telephoned him, a certain rate, and he came in that afternoon and I told him that I would see Fuller, as I had no authority to take the risk or enter it, but would telephone him Monday."  The witness denied that, either at that interview or any other time, he had had any conversation with the plaintiff about the particular cargo in suit; and also denied that prior to the plaintiff's return from St. Louis he had had any talk with him in regard to placing this cargo of the Bridgeport with the defendant company.

Thomas H. Lord, secretary of the defendant company, testified, as a witness for the defence, that he had served in that capacity for seven years; that he had a conversation with the plaintiff, about the time the Bridgeport cleared for New Orleans, in reference to the effect upon the policy of the substitution of the mate for the captain; that he told him that it would not affect the policy; that the plaintiff did not at any time ask him to take the risk upon the lost cargo; that he never heard the subject of that cargo alluded to by the plaintiff until after the loss of the Bridgeport and the plaintiff's return from St. Louis; that while the defendant's office was open for business they intended to have some one there to attend to business; that the taking of risks would stop when he and Fuller were out; that he had been

in the habit of taking risks in the absence of Fuller, subject to his approval on his return; that he had completed the contract in the absence of Fuller; that this had been done for two or three years, and was subject to Fuller's approval; that he could not name an instance in which a policy was issued by him or a risk taken, and the contract completed, in which anything was done by Fuller in regard to revoking it or changing it, because he was careful not to take a risk that was not good; that this practice on his part was known to all the clerks. The cross-examination of this witness was further continued as follows:

" *Q.* Supposing a man had an open policy in your office covering all his cargoes of a certain description in a certain vessel from a certain port to Boston, and he came in and said to you he would like to have an entry made of a certain cargo upon that policy, you would put some paper on your spindle indicating that application, where that entry was to be made; and it would remain in that shape until a subsequent period, when the details were received by the invoices or otherwise, and you were in a condition to write out the indorsement on the policy, wouldn't it? — *A.* I would, after Fuller had approved of it.

" *Q.* I am talking about the case of the absence of Fuller; supposing Fuller had gone to a boat-race or otherwise? — *A.* They would be submitted to Fuller first.

" *Q.* I am talking about cases where you accept the risks. — *A.* We do not accept the risk in such a case as that, where it can wait until Fuller sees it.

" *Q.* I am talking about a case which cannot wait. Supposing a man has an open policy in your office, the ship about to sail from a distant port, and he comes into your office and desires to have a cargo, such a cargo as was comprehended by the terms of the policy, indorsed upon the policy, stating to you that he is unable to give the details because his invoices have not come; a case of emergency, therefore, in which the risk is to be covered then. Is not it your practice in such a case as that, if it was one of the risks covered by the general terms of the policy, to accept the risk, and then put on your spindle some paper or memorandum of some kind or other indicating the nature of the indorsement, and does not it remain in that condition until

at a subsequent period you get the particulars and then make the indorsement on the policy? — *A.* If he makes the application, until it is completed it remains on the binding files, as we call it.

" *Q.* That is, you do not undertake to make the indorsements at length on the policy, as a rule, until you get the invoices, or until the details can be furnished? — *A.* No."

It was agreed that there was no charge on the defendant's books in relation to the lost cargo.

It did not appear that the plaintiff had any knowledge as to the acts of the secretary of the defendant company done in the absence of its president, nor that any of said acts had been reported to the directors, or any of them; nor did it appear that Littlefield, the clerk, made any report to the president or secretary of the defendant of an acceptance by him of the risk in question; the only evidence tending to show that such acceptance was reported to either of those officers being that contained in the plaintiff's testimony above set out; nor did it appear that the action of Lord, as testified to by the plaintiff, in accepting the risk in suit, was subsequently ratified by the company.

At the close of the evidence, the defendant asked the judge to rule that, upon the evidence, the plaintiff could not maintain this action. The judge refused so to rule.

The defendant asked the judge to instruct the jury as follows: "1. Where the by-laws of the company fix the duties of the officers, one officer cannot delegate to another the duties specially assigned and limited to him by such by-laws. 2. There is no evidence tending to show that Lord, the secretary, was authorized to accept risks, and, as matter of law, he was not so authorized. 3. By the terms of the contract, if any, between the parties, the plaintiff, within a reasonable time after the arrival of the invoices, was bound to bring them to the company, or the information contained therein; and, failing so to do, the contract was not completed, and the defendant is not liable."

The judge gave the first of said requests, but refused to give the second and third, and instructed the jury in substance as follows: The plaintiff must show, not only that some person

in behalf of the company did accept the risk on the lost cargo, but also that that person was authorized to act for the company; that it was not contended that the clerk, Littlefield, was so authorized.

The judge further instructed the jury as follows: "The by-laws, defining the authority of the president and of the secretary, do not specify anything in regard to the authority to indorse a risk upon an open policy of this kind; there is something in regard to authority to sign policies, and authority to create risks, to make the contract. I instruct you, as matter of law, that there is nothing in that by-law that excludes the secretary from having authority to write in or indorse a risk of this kind in a policy of this kind. It is a question of fact for you to determine whether the secretary had that authority, and for you to determine upon all the evidence. There has been evidence introduced here as to what was the custom of the office as to what the secretary had done, and what he had been permitted to do, and had done, with the knowledge and without the objection of the president and directors. It is for you to say how much proof there is of that, and it is entirely for you to say what the result is, whether upon the whole evidence, as matter of fact, the secretary did have authority to take this risk in the sense of indorsing it and agreeing that it should be indorsed as one of the risks which should be covered by the policy, the policy having been issued by authority, and no question having been made about that, the only question being as to the particular risk in question.

"Then there is some evidence in regard to the president. There is some question about his authority; for although the by-law does not mention authority to do this specific act, yet it authorizes him to sign policies, and to issue them, and to make insurance, and that would undoubtedly include this. It is for you to say, then, whether, through either of those persons there was an agreement by which it was understood between either Fuller or Lord and the plaintiff that this risk should be included in that policy, and should be indorsed according to the provisions, and if there was such agreement with either of them, then whether it was with one who was authorized to bind the company in that respect.

" Then the defendant says further, that there was no indorsement, and that it is necessary that there should be an indorsement upon the policy; not only an agreement between the parties that the property should be at risk, but that it should also be indorsed. It is not necessarily decisive of the plaintiff's case that that was not indorsed. There must have been an agreement that the cargo should be included in that risk, and that it should be indorsed; but it was not necessary that it should be indorsed at the time that agreement was made, if it was understood that it was to be indorsed at some future time. 'If it was understood that it was to be indorsed at the time, but was not, through mistake or accident, if it was understood that it was to be indorsed at some future time when the invoice should arrive, because until that time the whole and complete indorsement could not be made, only partial, and if it was the understanding of the parties who made the agreement, either from any particular agreement between themselves or from the general course of business in such cases, that the actual indorsement was not to be made until the invoice was received, and it could be made in full then, of course not making it would not be binding upon the parties, and in such a case as that the plaintiff on receiving the invoice would be under obligation to use reasonable diligence to apply to the defendant to give the company notice of the receipt of the invoice, and to request that the indorsement should be made according to the agreement. And there is evidence here that at some time the plaintiff did, through his agent and son, who was authorized by him, present the invoice to the company, and request that that indorsement should be made.

" It is contended that that was not done within a reasonable time; that the invoice was received several days before this was done. That is a question for you to determine. A plaintiff situated as this one is might have delayed presenting the invoice and demanding the actual indorsement so long as to cut him off from his remedy. If that was the agreement between the parties, then that should have been done within a reasonable time; and if it appeared that it had been delayed, and if it appeared that the company had suffered from the delay, — that their rights had been impaired by it, — then that might be a

sufficient answer. I shall leave it to you to say, under the circumstances of this case, if you come to that question, and if it is material to you to say, whether that demand was made, whether the invoice was presented and the demand was made for the indorsement within a reasonable time. If you find that that was the agreement between the parties, if you find that that agreement included within itself the understanding that the indorsement was not to be made at once, but at some future time, and if you find that the demand was made for an indorsement in accordance with that agreement, in substantial compliance with it, then the plaintiff has made out a case, and he is entitled to recover just as if the indorsement had been made at the time. It is for you to say if it is so."

The judge gave appropriate instructions upon other branches of the case, which were not objected to.

The defendant excepted to so much of the foregoing instructions as stated that it was for the jury to say whether the risk in suit was accepted by the company, and also to so much of said instructions as permitted the jury to find authority on the part of the secretary to accept the risk in suit from acts done not in the presence of the plaintiff, and not shown to have come to his knowledge, and not shown to have been known to the defendant company or its directors, or any of them, otherwise than as may be inferred from the testimony above set forth.

The jury found for the plaintiff in the sum of $9434.55; and the defendant alleged exceptions.

*J. C. Dodge & S. H. Tyng,* for the defendant.

*R. M. Morse, Jr. & W. B. Durant,* for the plaintiff.

C. ALLEN, J. The plaintiff sought to escape from the effect of the provision in the policy, " no risk to be binding until accepted by the company and indorsed herein," by proof of an oral contract; and the defendant, while denying that such oral contract had been made, sought to confirm its view by calling a witness familiar with the customs and usages of the business of marine insurance in Boston, and asking him the question " whether there is any usage as to the matter of making written applications for marine insurance." The question was excluded; and the grounds upon which the defendant urges its competency are, that the evidence of the usage would have

tended to show an improbability of the truth of the plaintiff's testimony as to the making of oral applications for the insurance, and that the oral applications, if made, were merely preliminary negotiations, and not designed to override the usage. The bill of exceptions contains no statement of what the defendant offered or expected to show by this witness; but we do not dwell upon this consideration, because we are of the opinion that evidence of a usage to require written applications would be incompetent, for the purpose of meeting evidence on the part of the plaintiff tending to prove an oral contract of insurance. The fact that contracts of insurance are usually in writing, and expressed in the form of policies, is a matter of common knowledge, and needs no witness to prove it, and it might have been, and doubtless was, assumed on the trial of the present case; and indeed this appears by implication from the whole course of the bill of exceptions.

But it is also well settled, and it is now too late to question the doctrine, that an oral contract of insurance may be valid. *Sanborn* v. *Fireman's Ins. Co.* 16 Gray, 448. As was said in that case, " It is not easy to see the force of the reasoning which would infer that, because parties usually make their contract in one way, it would be void when they choose to make it in another, equally good at common law, and not prohibited by any statute." See also *Relief Ins. Co.* v. *Shaw*, 94 U. S. 574. A usage that an oral contract, if made, is considered invalid, would be plainly repugnant to law, and void. In the present case, the evidence of usage was offered, not in aid of the construction of a contract, but to support the position that no contract whatever had been made. If a contract had in point of fact been made as alleged, it was of no consequence whether it was according to general usage or not. The defendant's own usage sufficiently appeared from the provision in the policy already copied, and its by-laws were in evidence, with a provision that " the president shall receive applications for insurance; fix the rates of premium, and the sums to be taken ; sign all policies," etc. The plaintiff's case proceeded with a full recognition of the fact that it was necessary for him to show a contract not according to the usual course of the defendant's dealing; and direct testimony was introduced, on both sides,

upon the precise point whether an oral contract of insurance had been made or not. There is nothing to show that any restriction was put upon any inquiry as to the defendant's own usage. It is no legitimate confirmation of the defendant's position, under such circumstances, to show that other insurance companies usually require applications for marine insurance to be in writing, as a condition of making the contract. This fact, if proved, would have no legal tendency to show that these parties did not make a contract orally. The plaintiff was not bound in law by such custom, if it existed. Whether other parties were or were not in the habit of making their contracts in a particular form, was nothing to him. An oral contract was lawful; and the evidence was properly confined to the question whether this particular oral contract had been made, as testified by the plaintiff, without going into the general inquiry, whether other parties were accustomed to make such contracts. The issue being whether a particular contract had or had not been orally made, as it might lawfully be, evidence that contracts in that form were unusual was not admissible to meet and control evidence that such a contract had in fact been made. To hold otherwise would be to extend the office of a usage beyond any known precedent.

In *Sanborn* v. *Fireman's Ins. Co.*, *ubi supra*, which was an action upon an oral contract of insurance, the book of entries of the defendant's agent, in which the alleged contract was not entered, was offered in evidence to corroborate his testimony that no contract had been made, and was excluded; and a point settled in *Rennell* v. *Kimball*, 5 Allen, 356, is in principle precisely like the one before us. In that case, the plaintiff, a master mariner, purchased of the defendant, by a written contract and a bill of sale, one twelfth of a vessel then undergoing repairs. It was in dispute, and there was a direct conflict in the evidence, whether the parties agreed that the title should not vest in the plaintiff till the repairs were completed, and whether the defendant promised to pay for the repairs. A ship-broker of long experience was allowed to testify, at the hearing before a master in chancery, "that it was very unusual for a master to buy a master's interest in a vessel undergoing repairs, and that it would be an unheard of case to sell

such an interest to a master, and he to pay his contributory share of the expenses of the repairs." The court say, in reference to this : " The admission of the testimony as to a usage or custom in the purchase of masters' interests in vessels was incorrect, and a finding based in any degree upon it would be erroneous. The evidence did not tend to prove any custom valid in law." 5 Allen, 365. It may also be added, as further reasons for holding the exclusion of the testimony in the present case correct, that there was no offer to show that the plaintiff was acquainted with the supposed usage, or that the usage related to the indorsement of particular risks upon open policies as well as to the original contract of insurance, nor can we know that the defendant expected to prove that the custom was not only general, but universal and uniform. *Porter* v. *Hills*, 114 Mass. 106. *Scudder* v. *Bradbury*, 106 Mass. 422. *Howard* v. *Great Western Ins. Co.* 109 Mass. 384.

The defendant asked the court, at the close of the evidence, to rule that, upon the evidence, the plaintiff could not maintain this action ; which the court refused to do. In support of this request, the defendant has argued to us that, under the provision of the open policy already cited, an acceptance of the risk by the company and an indorsement of it on the policy are made conditions precedent to the commencement of the risk; and it is urged that the language used is widely different from that used in *E. Carver Co.* v. *Manufacturers' Ins. Co.* 6 Gray, 214, and in *Kennebec Co.* v. *Augusta Ins. Co.* 6 Gray, 204. But we think there can be no doubt that an oral agreement for a present insurance according to the terms of a written and existing open policy, which insurance is to continue until it is superseded by the entry of the risk upon the policy, must mean according to those terms so far as they are applicable to such an oral agreement ; and if such policy contains a provision that no risk shall be binding until indorsed therein, such provision is annulled by the later contract, or is not included in it. The oral agreement necessarily implies that such condition is excepted out of it, and is not a part of it. The circumstance that the policy, as issued, contains such a condition precedent, does not preclude the company from orally accepting a new risk, subject to all the other provisions of the policy, with an agreement to put it in writing

thereafter by indorsing it upon the policy. There is no legal difficulty in such a construction. Parties to an existing written agreement may, by a new contract not in writing, annul it, or add to or subtract from it, or vary or qualify its terms, and thus make a new contract, which is to be proved partly by the written agreement, and partly by the subsequent verbal terms engrafted upon what will then be left of the written agreement. 1 Chit. Con. (11th Am. ed.) 154, 155. 1 Greenl. Ev. §§ 302, 304. Illustrations of the application of this rule, pertinent to the present case, are numerous. *Goodrich* v. *Longley*, 4 Gray, 379. *Kennebec Co.* v. *Augusta Ins. Co.*, *ubi supra*. *Commercial Ins. Co.* v. *Union Ins. Co.* 19 How. 318. *Rathbone* v. *City Ins. Co.* 31 Conn. 193. *Ins. Co.* v. *Norton*, 96 U. S. 234. It is as if the insurance company through its officers should say, " We will take the risk now, and put it upon the policy." The case does not fall within the principle of *Batchelder* v. *Queen Ins. Co.* 135 Mass. 449, and other similar cases, where it was sought to prove an oral agreement contradicting the writing, and contemporaneous with it.

The defendant also contends that there was no sufficient evidence of Lord's authority to make a contract of insurance in the absence of the president, and on this ground excepts to the admission of the evidence of the alleged contract between the plaintiff and Lord. The provision of the by-laws, that, " in case of the absence, inability, or death of the president, policies and other papers shall be signed by two directors," relates only to the formal execution of papers which require signing, and does not exclude the making of oral contracts of insurance by any officer who may have authority, or be held out as having authority, to make such contracts. *Sanborn* v. *Fireman's Ins. Co.* 16 Gray, 454. *Commercial Ins. Co.* v. *Union Ins. Co.* 19 How. 321. *Ins. Co.* v. *Colt*, 20 Wall. 560. *Eames* v. *Home Ins. Co.* 94 U. S. 621. *Walker* v. *Metropolitan Ins. Co.* 56 Maine, 371. *Davenport* v. *Peoria Ins. Co.* 17 Iowa, 276. In the present case, the plaintiff testified to certain conversation with Lord, the secretary, which included the contract relied on. He added, that Fuller was not present at the time, and that his talk was with Lord alone; that a few days before he had told Littlefield, the clerk, that he wanted him to enter up $10,000 on this cargo,

to which Littlefield answered, "All right." He also testified to an earlier conversation with Fuller, the president, in which the latter said that the defendant would take the cargoes of the Bridgeport. Fuller himself testified that Lord was secretary, and next officer after himself and the vice-president, who was in New York; that he (Fuller) sometimes signed policies in blank and left them in order that Lord might make the contract and deliver the policy; that probably Lord had received applications and made indorsements upon policies of this description in his (Fuller's) absence, though he did not remember any particular case; that it was his belief that it had been done; that he presumed people had been in and had indorsements when he was away; that he had never forbidden the secretary to make such indorsements, and, so far as he knew, nobody had ever forbidden it, though he had known of it all through the time the company had been in existence; that he did not think the business of the company stopped when he was gone, and did not intend that it should; that all the directors were in the habit of dropping in at the office, but "did not pretend to have much to do about the business, except we asked their advice sometimes." Lord also testified, that while the office was open for business they intended to have some one there to attend to business; that for two or three years he had been in the habit of taking risks when Fuller was away, subject to his approval on his return; that in such cases he completed the contract with the assured in the absence of Fuller, and could not name an instance in which Fuller had revoked or changed a policy issued or risk taken by him; and that this practice had been known in the office to all the clerks. From this testimony the inference might properly be drawn by the jury, that Lord had the requisite authority, express or implied, to enter an indorsement·upon the open policy, and to make a binding oral agreement to do so, and meanwhile to carry the risk. *Relief Ins. Co.* v. *Shaw*, 94 U. S. 574, 579. *Smith* v. *Hull Glass Co.* 8 C. B. 668; 11 C. B. 897, 927. *Allard* v. *Bourne*, 15 C. B. (N. S.) 468.

The defendant further contends, that, even supposing Lord's authority sufficient, the words which the plaintiff puts into his mouth do not necessarily or naturally imply an intention on his

part to waive or annul the condition precedent contained in the policy. But, in the opinion of a majority of the court, the jury might properly be left to say what the conversation meant, in view of all the circumstances. If the jury gave credit to the plaintiff's testimony, we cannot say, as matter of law, that no contract was proved.

Finally, it is urged that, by the plaintiff's failure to bring in the invoice, or the information contained therein, to the defendant, within a reasonable time after its arrival, the contract was not completed, and the defendant is not liable. But it was for the jury to determine whether September 12 was a reasonable time; and, if they found that the defendant then disclaimed having any contract with the plaintiff in respect to this cargo, there was no occasion for him to bring in the invoice afterwards.                                        *Exceptions overruled.*