IRENE G. CONAHAN *vs.* A. COLEMAN FISHER.

LEMAN I. CONAHAN *vs.* SAME.

Suffolk.   November 19, 22, 1918. — June 24, 1919.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Landlord and Tenant*, Repairs, Landlord's liability to member of tenant's family. *Evidence*, Admissions, Competency.   *Custom.*

If the second floor of a three-tenement house containing a separate tenement on each floor is let to a tenant, a railing of a platform and a corner post supporting the platform, forming a part of the tenement and within the horizontal planes bounding the second floor, are a part of the demised premises, which, unless otherwise provided by express agreement, the landlord is under no duty to keep in repair.

The mere fact that the supporting post, above described, constituted a part of the exterior construction and framework of the building essential for the other tenements as well as for the second floor tenement, does not bring it within the rule requiring the landlord to keep in repair portions of the building such as stairways and passageways, which are used in common by the occupants of the building and control of which is retained by the landlord.

The mere facts, that the landlord at the request of the tenant made repairs upon the demised premises, above described, from time to time, and that, about one month previous to an injury received by the wife of the tenant of the second floor and due to the giving way of the railing above described, a sagging condition of the platform had been called to the attention of the landlord, who had employed a carpenter to look the platform over but who had not made any repairs, does not constitute an admission of responsibility on the part of the landlord for the injury to the tenant's wife.

In an action against the landlord by the wife of the tenant of the second floor for the injury received as above described, it *was said* that, if it was assumed that the defendant had agreed to make outside repairs upon the building, the ordinary implication was that he was to do so only upon reasonable notice, and that there was no evidence of notice as to a defect in the railing, the breaking of which caused the injury.

At the trial of an action by a member of the family of a tenant of one floor of a three-tenement building against the landlord for personal injuries resulting from the breaking of a railing which was a part of the demised premises, where it appears that the tenancy was not under a lease in writing and that there was no express warranty by the landlord that the premises were reasonably fit for use nor any express agreement that he would keep them in a safe condition nor in the condition in which they were at the beginning of the tenancy, a custom is not admissible in evidence to the effect that, in the city where the accident occurred, in the letting of tenements without a lease in writing, when nothing

was said between the owner and the prospective tenant as to repairs, the owner should make necessary repairs and keep the property tenantable and in safe condition, such custom being invalid because contrary to the general rules of law.

Customs, which are in conflict either with express or with implied terms of a contract or undertake to avoid the effect of settled rules of law or to make for a definite class of cases or persons a law singular to such class, are invalid.

Collection and discussion by RUGG, C. J., of decisions relating to the effect upon contracts and commercial transactions of customs and usages.

TWO ACTIONS OF TORT, the first action being for personal injuries suffered in a fall caused by the giving way of a railing of a platform at the back of and a part of a tenement let by the defendant to the husband of the plaintiff; and the second action being by the husband for consequential damages. Writs dated June 30, 1916.

In the Superior Court the actions were tried together before *Chase*, J. The material evidence is described in the opinion. At the close of the evidence, the judge ordered verdicts for the defendant; and the plaintiffs alleged exceptions.

The cases were argued at the bar for the plaintiffs in November, 1918, before *Rugg*, C. J., *Loring, Braley, Pierce, & Carroll*, JJ., and afterwards was submitted on briefs to all the Justices.

*F. L. Norton*, for the plaintiffs.

*E. C. Stone*, for the defendant.

RUGG, C. J. The plaintiffs, a woman and her husband, in these two actions of tort seek to recover from their landlord, the owner of the house, damages caused to them by the fall of a railing of a platform attached to and forming part of their tenement. There was evidence tending to show that the male plaintiff, several years before the events here in issue, orally hired at a monthly rental the tenement, which consisted of the second floor of a three-story wooden apartment house; that the tenement so hired consisted of a number of rooms within the main wall of the building, together with a balcony or platform for the exclusive use of the tenant outside the main wall of the building but adjacent to it and upheld by girders, which were supported in part by a corner post running from the bottom to the top of the building; that certain repairs were to be and were made by the defendant before the tenancy began, and thereafter all repairs requested by the plaintiffs were made, including painting and papering and

such like improvements; that about a month previous to the accident the male plaintiff observed that the floor of this platform was sagging and tending to fall away and become detached from the remainder of the building and notice was given to the agent of the defendant, who said that it should be fixed; that shortly thereafter the defendant employed a carpenter to look over the platform and see what was the matter with it, but that nothing had been done toward fixing it before the accident; that while the female plaintiff was leaning against the railing of the platform it gave way, causing injuries to her; that this was due to the rotten condition of the supporting post and of the railing.

A verdict rightly was ordered for the defendant on this evidence. The railing and the corner post, so far as within the horizontal planes bounding the second floor of the house, were a part of the demised premises. The wife doubtless had all the rights of a tenant. *Domenicis* v. *Fleisher*, 195 Mass. 281. But the platform was not under the control of the landlord. It was within the confines of the tenement. It formerly was not an uncommon event for the owner to convey one or more rooms out of a house. The dower of a widow often was set off by assigning to her the use of certain rooms in a homestead. There are numerous instances of such division of a dwelling being accomplished by will. Partition among tenants in common not infrequently resulted in the subdivision of the ownership of a house. In all these instances the ownership of the outside wall or supporting posts ordinarily was not retained out of a deed, partition, or devise, and merely cubic space bounded by the inner surface of walls, floors and ceilings made the subject of the transaction. A lease is merely a form of transfer of a right in real estate. It is difficult to think of a tenement apart from enclosing and supporting parts of the building. That conception does not ordinarily accompany the relation of landlord and tenant. Familiarity with it as a form of eminent domain is recent. *Old South Association* v. *Codman*, 211 Mass. 211. That such a platform is a part of the demised premises was decided in *Phelan* v. *Fitzpatrick*, 188 Mass. 237, which governs the present case on that point. See also *Nash* v. *Webber*, 204 Mass. 419, 425.

It has been argued ingeniously that, because the corner post of the building in part supporting the platform constituted a part

of the exterior construction and framework of the building essential for other tenements as well as for that of the male plaintiff, the landlord was bound to keep them in repair, on the same principle which holds the landlord responsible for the safe condition and continued repair of common stairways and passageways.  *Andrews* v. *Williamson,* 193 Mass. 92.  *Pizzano* v. *Shuman,* 229 Mass. 240, 243.  That principle has no application to such facts as are here presented.  The way in which the liability of the landlord for defects in common stairways and passageways has grown up and been developed shows that liability in a case like the present cannot be predicated upon that principle. The landlord retains control of common stairways and passageways.  Hence for practical reasons he is held responsible for their safety, although, as pointed out in *Flanagan* v. *Welch,* 220 Mass. 186, 191, that liability is contrary to the principle commonly governing the relations of parties where one has an easement over property of another.  From a structural standpoint a building is a unit, every essential part of which is needful for the strength and support of every other part.  If the liability of the landlord touching repairs were made to rest on the proposition here urged, little would be left of the general principles of the law of the landlord and tenant as it has been developed and practised respecting oral leases.  The law of landlord and tenant is founded on the conception that the demised premises pass into the control of the tenant.  That is its basis.  Such control is commonly exclusive. Lack of control by the landlord involves relief from obligation to repair.  Said Mr. Justice Knowlton in *Szathmary* v. *Adams,* 166 Mass. 145, 146, "It is a familiar rule of law, that, in the absence of an express agreement to the contrary, the owner of a tenement let to a tenant is not bound to make repairs upon it during the term, and that the tenant alone is liable to third persons for damages caused by suffering the premises to become dangerous for want of proper repairs."  This is the doctrine of the earlier and later cases through many years.  It is firmly imbedded in the common law of this Commonwealth and generally elsewhere.  It is only when it is a part of the agreement between the parties that the landlord shall maintain the tenement in repair and shall retain possession and control of the tenement for that purpose, and the right of the tenant is confined to a simple use of the tenement

without control for that purpose, that the landlord can be held liable in tort for failure to keep in repair. *Miles* v. *Janvrin,* 196 Mass. 431. Cases like *Hilden* v. *Naylor,* 223 Mass. 290, and *Priest* v. *Nichols,* 116 Mass. 401, where the landlord retained possession and control of the roof or other part of the building, are distinguishable from the case at bar and have no relevancy to the facts here disclosed.

The making of repairs by a landlord from time to time in response to the request of a tenant does not constitute an admission of responsibility on the part of the landlord. These are gratuitous acts which do not impose continuous liability. *McKeon* v. *Cutter,* 156 Mass. 296. *Kearines* v. *Cullen,* 183 Mass. 298. *McLean* v. *Fiske Wharf & Warehouse Co.* 158 Mass. 472, 474. *Hannaford* v. *Kinne,* 199 Mass. 63. *Phelan* v. *Fitzpatrick,* 188 Mass. 237.

If it be assumed that the defendant had agreed to make outside repairs, the ordinary implication is that he was to make such repairs only upon reasonable notice. *Marley* v. *Wheelwright,* 172 Mass. 530. *Mills* v. *Swanton,* 222 Mass. 557, 559. There was no evidence of notice to the landlord of defect in the railing of the platform or the corner post. The sagging of the platform was a different matter.

The tenant offered testimony to show that there was a universal custom, in Boston where the accident occurred, in the letting of tenements without written lease, when nothing was said between the owner and the prospective tenant as to repairs, for the owner to make necessary repairs and keep the property tenantable and in a safe condition. It was excluded subject to the plaintiffs' exception.

Certain rules of law touching the respective rights and liabilities of landlord and tenant have become thoroughly fixed. No warranty is implied by the letting of premises that they are reasonably fit for use. The lessee takes an estate in the demised premises and he assumes the risk of their quality in the absence of an express warranty or deceit. *Tuttle* v. *Gilbert Manuf. Co.* 145 Mass. 169. There is no duty implied by the relation of lessor and lessee that the former shall keep the premises in a safe condition while in the possession of the latter, or in the same condition as they were in at the beginning of the tenancy. *Walsh* v. *Schmidt,* 206

Mass. 405. *Kearines* v. *Cullen*, 183 Mass. 298. It was said in *Galvin* v. *Beals*, 187 Mass. 250, 252, with ample citation of authorities, that "The general rule in this Commonwealth must be considered as settled that a tenant cannot recover against his landlord for personal injuries occasioned by the defective condition of the premises let, unless the landlord agrees to repair, makes the repairs, and is negligent in making them." This rule has been reaffirmed in numerous cases subsequently decided. See, for example, *Mackey* v. *Lonergan*, 221 Mass. 296; *Lane* v. *Raynes*, 223 Mass. 514; *Rolfe* v. *Tufts*, 216 Mass. 563; *Miles* v. *Janvrin*, 200 Mass. 514; *Baum* v. *Ahlborn*, 210 Mass. 336. See also *Tredway* v. *Machin*, 91 L. T. (N. S.) 310.

These are the well settled incidents of the contract between the parties arising out of the relation of landlord and tenant. They are the terms of the contract implied from the existence of that relation. They also are the principles of law controlling the rights of lessor and lessee when not varied by the provisions of an express contract. They spring from the essential attributes of a lease, whether oral or written. These principles of law have been much discussed throughout our reports, because the contract implied from an oral lease of a tenement is so common and extends widely through the Commonwealth. The governing rules have become rules of property.

The practical effect of admitting testimony of such a custom would be to overrule by evidence all these and many other like decisions. It is not the province of custom or usage as recognized by the law to accomplish any such result.

A thorough discussion of the nature of custom or usage, the field of human relations which may be affected thereby, and the bounds to which it is subject, is found in *Dickinson* v. *Gay*, 7 Allen, 29, where previous decisions are reviewed, and the controlling principle on the subject is deduced and formulated. It there was held in effect that, although often a usage or custom has been sustained or rejected on the ground that it was or was not regarded as reasonable, the true principle is that a custom or usage "having reference to the methods of transacting business," is valid, but one which relates to the "mere adoption of a peculiar or local rule of law, contrary to the terms of the contract or to a general rule of law applicable to its construction," is invalid.

Respecting the alleged custom there in question of holding a merchant, selling goods by sample, where both sample and the bulk delivered contained a latent defect, nevertheless responsible as upon a warranty against defect, it was said, page 37: "the usage proved does not relate to any particular course of dealing, but is the adoption of a mere doctrine as to the rights and obligations of the parties under a contract of sale, which doctrine is contrary to the rule of the common law on the subject. It holds that a warranty is implied, when by law it is not implied. . . . There is no necessity for such usages; because if the parties agree that there shall be a warranty where the law implies none, they can insert the warranty in the bill of sale; or if the manufacturer sells without warranty, he can so express it. But if such usages were to prevail they would be productive of misunderstanding, litigation and frequent injustice, and would be deeply injurious to the interests of trade and commerce. They would make it necessary to prove the law of the case by witnesses on the stand, and it would be settled by the jury in each particular case. Public policy, therefore, requires that when parties assume obligations which the law does not impose, or release obligations which it does impose, it should be done by express contract. For this reason, the remark of Mr. Justice Story, in 2 Sumner, 569, that of late years the courts of law both in England and America have been disposed to narrow the limits of the operation of such usages, and not to extend them, has been quoted with approbation both in England and in the courts of our sister States." That statement of law is precisely applicable to the custom here sought to be shown. This decision has often been cited with approval. Subsequent cases have applied its principle but have not narrowed or enlarged its scope. For example, it was said by Chief Justice Gray in *Taber* v. *China Mutual Ins. Co.* 131 Mass. 239, 252: "Evidence of usage . . . is never admissible to control the rules of law as to the mode in which a loss [under an insurance policy] shall be computed;" and by Mr. Justice Wells in *Haskins* v. *Warren*, 115 Mass. 514, at pages 535, 536: a "usage . . . may therefore be resorted to for aid in supplying the unexpressed terms of . . . agreements. . . . In this way it may modify the application of general rules of law. But it cannot be allowed . . . to engraft on a contract . . . a stipulation or obligation different from or inconsistent with the

rule of the common law on the same subject;" and by Chief Justice Bigelow in *Reed* v. *Richardson*, 98 Mass. 216, at page 218: "Any usage, in order to be operative . . . must also be of such a nature that it does not in any degree tend to controvert the well established rules of law." The subject of custom also was considered with care in *Barnard* v. *Kellogg*, 10 Wall. 383, where it was said, at pages 390, 391: "The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this. . . . And it is well settled that usage cannot be allowed to subvert the settled rules of law." In the application of this principle it there was held that a custom overthrowing the rule of *caveat emptor* in a purchase of wool was bad. *Dickinson* v. *Gay*, 7 Allen, 29, and *Dodd* v. *Farlow*, 11 Allen, 426, both were quoted with approval. See, also, *Allen* v. *St. Louis Bank*, 120 U. S. 20, 39. In *Thompson* v. *Riggs*, 5 Wall. 663, 679, 680, it was said: "Judge Story expressed himself strongly against local usages or customs . . . set up to controvert or annul the general liabilities of parties under the common law as well as under the commercial law. . . . Usage contrary to law . . . is never admitted to control the general rules of law." *Bliss* v. *Ropes*, 9 Allen, 339, 343. *Dodd* v. *Farlow*, 11 Allen, 426, 429. *Snelling* v. *Hall*, 107 Mass. 134, 139. *Fletcher* v. *Dickinson*, 7 Allen, 23, 25. *Warren* v. *Franklin Ins. Co.* 104 Mass. 518, 521. *Hedden* v. *Roberts*, 134 Mass. 38. *Emery* v. *Boston Marine Ins. Co.* 138 Mass. 398, 409. *Little* v. *Phipps*, 208 Mass. 331, 334. *Savings Bank* v. *Ward*, 100 U. S. 195, 206, 207. Indeed, it has been held that parties cannot, even by express contract, establish a law for themselves contrary to the general law of the jurisdiction. *Nashua River Paper Co.* v. *Hammermill Paper Co.* 223 Mass. 8. Custom has been defined as "that length of usage which has become law. It is a usage which has acquired the force of law. . . . A general custom is the common law itself, or a part of it." *Walls* v. *Bailey*, 49 N. Y. 464, 471. *Strother* v. *Lucas*, 12 Pet. 410, 445, 446. *Albright* v. *Cortright*, 35 Vroom, 330. *Russell* v. *Ferguson*, 77 Vt. 433, 435. *Milroy* v. *Chicago, Milwaukee & St. Paul Railway*, 98 Iowa, 188, 194.

The law itself has, however, fixed with precision the respective

rights and obligations of landlord and tenant under an oral lease as to repairs upon the demised premises in the absence of definite contract. It is beyond the province of custom to vary this rule. It can be done only by express contract. Two diametrically opposed principles of law cannot govern the same facts at the same moment.

General commercial customs or particular usages of trade, when not contrary to the express terms or necessary implications of the contract, or a special meaning attaching under the dialect of a particular business, occupation or profession to the use of a word or phrase, and not invoking the application of law contrary to the established principles of the common or statutory law, are valid. *Proctor* v. *Atlantic Fish Companies*, 208 Mass. 351, 355. The numerous cases collected in the brief for the plaintiff, where a custom has been held admissible and valid, all come within this classification. But customs which are in conflict, either with the express or implied terms of the contract, or undertake to avoid the effect of settled rules of law, or to make for a definite class of cases or persons a law singular unto such class, are bad.

Within the inhibition of this classification falls the custom sought to be shown in the case at bar. So far as there is anything stated in the opinion in *Shute* v. *Bills*, 191 Mass. 433, 436, at variance with this conclusion, it is unsupported by authority and cannot be followed. The issue in that case related to the undertaking by the landlord to make repairs and the negligent performance of that undertaking. That is stated on page 437. It was on that footing that the judgment rested. Indeed in that decision, respecting an offer to show an established custom in Boston to the effect that the landlord retains control of the yard and the outside of houses including the roof and gutters, it is said on page 438: "the evidence was plainly inadmissible. It contradicts both the agreement of the parties and the rule of the law. Such a custom would be a bad one."

As matter of the strict authority of decisions, the case at bar on this point is governed by *Sawtelle* v. *Drew*, 122 Mass. 228, where it was held that a custom to engraft upon an agreement to hire a house, a custom that a lessor was required to clean a house before the lessee entered into possession of it, was bad. See, also, *Richardson* v. *Copeland*, 6 Gray, 536.

Upon another ground the custom was incompetent. It is provided by R. L. c. 127, § 3, that an oral lease creates only a tenancy at will, and in the absence of express agreement confers the rights and imposes the obligations on landlord and tenant which are universally incident to that relation throughout the Commonwealth. It follows that the tenancy at will of the statute cannot be governed by local or customary law, but has and must have the same legal operation in every city and town.

*Exceptions overruled.*