[Civ. No. 9457.   First Appellate District, Division Two.—July 23, 1935.]

CHARLES E. McDONALD, Respondent, v. STANDARD GAS ENGINE COMPANY (a Corporation) et al., Appellants.

Glikbarg & Wolf for Appellants Winslow and Standard Diesel Engine Company.

McEnerney & Morris, A. J. Coogan and Hatch & Mahl for Appellant Standard Gas Engine Company.

Elliott Johnson and Christopher M. Jenks for Respondent.

STURTEVANT, J.—For injuries sustained by the explosion of a pulley in an iron factory the plaintiff sued to recover damages. He named as defendants the Standard Gas Engine Company, hereinafter called the Gas Company, the owner of the plant; he also named Standard Diesel Engine Company, a lessee, hereinafter called the Diesel Company; and he also named Charles A. Winslow. The jury returned a verdict in favor of the plaintiff and against all of the defendants. From that verdict the defendants have appealed. As each appellant stands on a different footing, it is necessary to consider the appeals separately.

*Appeal of Standard Gas Engine Company.*

For many years the Gas Company, a corporation, has been engaged in manufacturing internal combustion engines. It has a manufacturing plant at Dennison and King Streets, East Oakland. Mr. Winslow is a mechanical engineer. For

some time he had in his mind certain theories regarding a new type of Diesel engine. Early in 1931 he made arrangements with the Gas Company under the terms of which he took employment with that company and proceeded to construct a monovalve engine under and according to the plans he had in mind. The costs were such that the Gas Company was unable to go further. However, it was desirable to proceed and construct multicylinder engines on the same general plans. Finally, the parties determined that a new corporation should be created which would take over the entire enterprise. A corporation, Standard Diesel Engine Company, was formed and on September 10, 1932, three several contracts were executed. They are called by this defendant "Defendant's Exhibits D, E and F". By those instruments, in legal effect, the Standard Gas Engine Company for one hundred shares of the common capital stock of no par value of the Standard Diesel Engine Company, agreed to exchange a single-cylinder Diesel engine, known as the Winslow engine, together with the castings, patterns, dies, accessories and blue prints, used in connection with the manufacture thereof, and a lease for the joint use by both corporations for the period of six months of both the labor and equipment of the plant owned by the Standard Gas Engine Company. The lease provided that the term thereof should commence on September 15, 1932, and continue until March 14, 1933. It contained no covenant that either tenant should have or exercise any control over the other. Nor did it contain any other special covenant pertinent to the issues presented in this action.

Mr. Winslow was designated manager on the records of each corporation. After the said documents were executed he performed no services for the Gas Company except to act gratuitously in an advisory capacity. From July 1, 1932, it paid him no salary. All materials which were thereafter used in the construction of Diesel engines were furnished and paid for by the Diesel Company. Except as recited in the said exhibits Mr. Winslow did not act for the Gas Company. Each corporation proceeded to function as in those papers provided. The record presents no question of fraud on the part of either of the corporations, or any of the officers thereof.

Prior to the twenty-seventh day of January, 1933, the Diesel Company had been engaged in the manufacture of multicylinder Diesel engines in the plant above mentioned. A rectangular room 17 feet by 27 feet was selected for the purpose and was known as the test room. Within it was a test stand for testing motors. It consisted of a motor bed to which was attached a dynamometer used to apply a load to the engine or to test its horsepower. On January 27, 1933, a four-cylinder multicylinder Diesel engine was mounted on the stand and attached to the dynamometer. A pulley wheel was mounted on the shaft protruding from the side of the dynamometer away from the engine. It had only one use—to start the engine at which time a leather belt connected it to an electric motor. When the engine started the belt would be pushed off and allowed to coil up at one side of the test room. After the engine started the pulley wheel revolved with the speed of the engine. The engine had been in place and had been operating day and night for a period of three weeks immediately preceding January 27, 1933. For some time prior to the date last mentioned Professor Carl A. Vogt, of the University of California, was conducting a post graduate course in mechanical engineering. He had a class in Diesel engines, the members consisting of a group of young naval officers. In the month of December, 1932, at a meeting of the Society of Automotive Engineers, a paper was read regarding the monovalve Diesel engine which had come to be known as the Winslow type. The students of Professor Vogt were not present at the reading but the paper was discussed in his classes. At times the classes visited various factories. One of the students asked Professor Vogt whether it would be possible to visit the Standard Gas Engine Company plant to see the Winslow Diesel engine. Professor Vogt thereupon telephoned to Mr. Winslow asking for permission and the request was granted. At 2 o'clock on January 27, 1933, Professor Vogt, together with the plaintiff and other members of the class, went to the plant. After the class arrived the Diesel engine was demonstrated to the class. During such demonstration the pulley wheel, hereinabove mentioned, exploded injuring several, including this plaintiff.

In paragraphs IV and V of his amended complaint the plaintiff alleged:

## "IV.

"That on or about the 27th day of January, 1933, *the defendant Standard Gas Engine Company, a corporation,* and the defendant Standard Diesel Engine Company, a corporation, *owned and were operating for purposes of demonstration a certain Diesel engine* at said factory; that on said day at about the hour of 2:30 o'clock p. m. thereof, *plaintiff at the invitation of the defendant Standard Gas Engine Company,* a corporation, and the defendant Standard Diesel Engine Company, a corporation, and the defendant Winslow, visited said factory for the purpose of inspecting said Diesel engine and its operation; that at said time and said place the plaintiff, *at the invitation as aforesaid of the defendant corporations and the defendant Winslow,* did in fact inspect said engine and the operation of said engine was demonstrated to plaintiff by the defendant Winslow; that during the operation of said engine the defendant Winslow personally exercised exclusive control of the operation thereof; that at all times herein mentioned *said Diesel engine and its operation were under the exclusive control of the defendant Standard Gas Engine Company, a corporation,* the defendant Standard Diesel Engine Company, a corporation, and the defendant Winslow; that at said time and said place there was attached to the brake shaft of said Diesel engine a certain metal pulley about thirty inches in diameter, constructed of ten cast iron spokes attached to a steel rim, owned by the defendant Standard Diesel Engine Company, a corporation; that during the operation of said Diesel engine said pulley was caused to revolve on the brake shaft of said engine at speeds as high as 1400 revolutions per minute; that during the operation of said Diesel engine said pulley was caused to revolve on the brake shaft of said engine at different speeds varying from 200 revolutions per minute to as high as 1400 revolutions per minute, *with the knowledge, consent and permission of the defendants Standard Gas Engine Company,* a corporation, and Standard Diesel Engine Company, a corporation.

## "V.

"That during the course of the operation of said Diesel engine, as aforesaid, *the defendants so carelessly and negligently*

*operated the same* as to cause said pulley to become detached from said shaft and to break into a number of fragments; that one of said fragments struck the body of plaintiff, and as a proximate result of said *carelessness and negligence of the defendants,* as aforesaid, there was inflicted upon plaintiff the following personal injuries, to-wit: (Naming them.)''

▮ This defendant claims there was no evidence that it was guilty of any actionable negligence. We think the point must be sustained. There was at no time any claim that the lessor or lessee departed from the provisions of the exhibits hereinabove referred to. While those exhibits provided for a joint right to use this defendant's plant, they did not provide for a synchronous joint use. They provided a scheme by and under which each company could transact its business separately, but under the same roof. Said exhibits did not vest any ownership to any Diesel engine in this defendant, but did provide for vesting ownership in the Diesel Company. As to the charges which we have italicized, an examination of the record discloses there was not a particle of evidence that after September 10, 1932, this defendant ever owned or operated, either alone or jointly with the Diesel Company any Diesel engine, nor that the Diesel engine mentioned in the plaintiff's pleading or its operation was under the exclusive control or any control whatever of this defendant, nor that said engine was operated with its permission, nor that it had any right or power to grant or withhold permission as to how and at what speed said engine could or should be operated.

▮ In support of his claim that this defendant invited him to the premises and that it operated the engine at the time of the accident the plaintiff presents several contentions. He contends that Mr. Winslow did not at once volunteer a statement for whom he was acting. The plaintiff does not quote any part of the record in which Mr. Winslow was asked whether his authority and duties as manager of either corporation was oral or in writing, or whether it was designated by the president or board of directors, and if so by whom. Counsel sought at times to elicit the conclusion of the witness on the subject of his authority. However, we find no statement showing that at the time of making the demonstration this defendant had assumed to give to Mr. Winslow

any direction or authority in the premises. ■ The second contention is that, in selecting the pulley, Mr. Winslow, as manager of this defendant, selected the pulley and turned it over to Mr. Winslow, as manager of the Diesel Company. The facts do not support the contention. The term of the lease commenced September 15, 1932. Thereupon the possession of the entire premises and all of the equipment became vested in the two corporations as tenants in common. (Civ. Code, sec. 686; *McClure* v. *Colyear*, 80 Cal. 378 [22 Pac. 175].) The documents signed September 12, 1932, do not show, and there is no evidence to show, that this defendant was after said date to make any selections for, or deliveries to, the Diesel Company after the vesting of the possession designated in the lease. ■ Then it is contended that when a lessor reserves a portion of the premises he must keep such portion in repair. (16 R. C. L. 1072.) But here no portion was reserved. The lease provided a tenancy in common. Under that instrument such tenants took on September 12, 1932, "*per my et per tout*". (*Lytle Creek W. Co.* v. *Perdew*, 65 Cal. 447 [4 Pac. 426].) At that time the evidence does not show there was any defect in the pulley. The record shows affirmatively that from the time Mr. Winslow took the pulley out of the storeroom it was in the exclusive use of the Diesel Company. Because the Gas Company was a tenant in common did not *ipso facto* render it liable for the acts of the Diesel Company. (*Marsh* v. *Hand*, 120 N. Y. 315, 321, 322 [24 N. E. 463].) If the plaintiff claimed that the two corporations were joint tort-feasors he had the burden of establishing those facts. (45 C. J. 895.)

*Appeal of Standard Diesel Engine Co. and Charles A. Winslow.*

These two defendants make two points not discussed above. They claim the plaintiff under the facts was a licensee and that there was no evidence of wanton or wilful injury and therefore they are not liable. And they also claim that the verdict for $100,000 was excessive. We will take up those two points separately in the order stated.

■ The federal government is one of the largest, if not the largest, purchaser of gas engines and of Diesel engines in particular. The plaintiff is a naval lieutenant, junior grade, having graduated from the United States Naval

Academy. Nearly all, if not all of the class of Professor Vogt were also young naval officers each of whom, some time in the future, might be called upon to pass on and approve large purchases by the federal government. That their attention was particularly centered on Diesel engines appears from the fact they were taking a post graduate course on that subject under Professor Vogt. There is considerable evidence in the record to the effect that after the Winslow type had been completely developed as a monovalve and satisfactorily developed as a multicylinder, these two .defendants were justly very proud of the inventions and anticipated at an early date that they would enter into the manufacture thereof on a large scale. So anticipating, numerous groups were allowed to attend, and when they did so, demonstrations were held for the purpose of advertising the new invention. These defendants cite ''the student cases'' where the facts showed the students attended to see the ''wheels turn 'round'', and in which it was held that the students were licensees. The plaintiff freely admits the general rule in ''the student cases'' but contends that the instant case contains facts that distinguish it from that general line. As to who is an implied invitee in *Aguilar* v. *Riverdale C. C. Assn.,* 104 Cal. App. 263, at page 266 [285 Pac. 889], the court said: ''If it be shown that his purpose in so entering was one of common interest or mutual benefit to the owner or occupant and himself, or was in connection with the former's business which was there being carried on, an invitation is implied.'' In the case of *Dyer* v. *McCorkle,* 208 Cal. 216, at page 218 [280 Pac. 965], the court said: ''There is no evidence whatever upon which to conclude that plaintiff was an employee of the master. In attempting to board the truck of defendant corporation, plaintiff was there as one of three classes of persons: A trespasser, a licensee or an invitee. If there without the knowledge or consent of the master or servant, he was a trespasser. If there without the knowledge of the master but with the knowledge of the servant, who had no authority to invite him, he was a mere licensee. But if there with the consent of the master or with the consent of the servant having authority, express or implied, to grant the privilege, he was an invitee. As an invitee he was entitled to ordinary care at the hands of the servant and the

omission in this particular would be binding upon the master if at the time of infliction of the injury the servant ·was engaged in accomplishing an object in the line of duties assigned to him by such master." In *Gilliland* v. *Bondurant,* 332 Mo. 881 [59 S. W. (2d) 679], is found a full discussion of the "student cases". After stating the facts in the case before it, on page 683 [59 S. W.] the court said: "It is a reasonable inference from the evidence that this was one of defendants' methods of advertising their products; that it was done through arrangements with the school authorities to bring classes there; and that they were brought there in connection with and as a part of their school work, not out of mere curiosity on the part of the children to watch the wheels go 'round." And then at page 689 [59 S. W.] the court said: "From the long-established custom of bringing this class and other classes there annually and instructing them in butter making and ice cream making just as any class is instructed in school, the jury would be justified.in believing that such an arrangement of long standing grew out of and was based upon some benefit to defendants, and implied an invitation to the school authorities." The facts of the instant case we think bring it clearly within the doctrine of the cases just cited.

It is earnestly asserted that the verdict was excessive and for that reason the judgment should be reversed. The verdict was in the sum of $100,000 and it will be conceded at once that that is a very high figure. It is equally clear that the injuries suffered were appalling. After the accident the plaintiff was taken at once to Highland Hospital. Dr. Schwartz, the assistant superintendent, was at the hospital when the patient arrived. He testified: "The patient arrived deeply unconscious and in a state of profound shock. There was a large area of the scalp torn loose, appeared to be about half scalped, over the left frontal region. A large strip of the scalp cap had been torn away, leaving an opening about the size of a saucer. The dura mater, which is the covering of the brain, had been torn in two, thus exposing the brain. Large quantities of mascerated brain tissue were exuding from the hole in the skull cap. His clothes were spattered with bits of brain tissue. I noticed on his left shoulder a big gob about the size of an English walnut. The wound was contaminated. It looked like streaks of grease or oil, bits of pulverized bone. . . . That was a compound com-

minuted fracture of the skull, and brain was exuding, and brain was spattered all over the outside.'' Dr. Allen, chief of staff of the hospital on brain injuries, gave similar testimony but stated that the hole broken in the skull cap measured two and one-half by two inches. Continuing Dr. Allen stated: ''He also had a contused wound on the left elbow which indicated a fracture of that elbow. . . . There was a large cut on his neck, his throat was cut. He had a lesion which made the left eye appear crossed. . . . There are several nerves in the brain, twelve on each side, that supply various structures about the head and the muscles that make our eyes move from side to side or up and down and are controlled by some of those nerves. One in particular called the sixth cranial nerve is the one that makes our eyes turn to the left and to the right. This particular nerve had been injured and he could not move his eye. There was one other nerve injured in his face, the seventh nerve. That nerve supplies the muscles of expression on the side of the face so that he was unable to wrinkle the face in the normal manner. There was another result much more serious, and this is what is known as aphasia. He was unable for many weeks after this accident to talk coherently, or to even make known his wishes. He understood our language but was unable for at least two or three weeks to express himself and that was due to a particular lesion of the left side of the brain. That in my opinion was the most serious injury sustained.'' He received apparently the best medical attention and hospitalization. While yet unconscious the patient was taken to the operating room, the wound in the skull was thoroughly cleansed, the dura mater was sewed up, the scalp was drawn over it and sewed up. In this form the skull wound was healed. The cranial nerves were in part grafted and much relief was given to the patient enabling him to more nearly control his left eye. The wound on the throat was satisfactorily treated and so was the broken elbow. At the time of the trial the patient had regained the power to talk—not fluently, but there had been some restoration of that function. The sixth cranial nerve could not be restored. The function of the nerve controlling facial expression appeared to be fully restored. The hole that had been broken in the skull remained but the dura mater and the scalp were in place over

the depression. The injury to the left eye had become less but at the time of the trial there was some loss of vision in that eye. Testifying as to the then condition of the left eye, Dr. O'Connor said: "He can see singly and not double and see straight ahead. Before we did the first operation there was motion upward about fifteen degrees from the straight position. We gained about ten degrees on that. If he is left in his present condition he can never turn his eye upward any more than at present. I have done all for him I expect to do." Dr. Fleming testified: "I examined Mr. Mc-Donald at our office yesterday afternoon. . . . He has a defect in the left frontal temple region that measures five centimeters by six. When you palpate this depression you can feel the brain substance underneath and when he coughs there is a very marked protrusion of the brain substance and along the frontal region there is a tenderness. He has a scar up there over his eye and ear. That resulted from the removal of the bone at the time of his injury. Defect is referable to the left eye. The left pupil is smaller than the right, and the left pupil does not react as well as the right. He cannot look to the left nor apparently upward, because the injury to the sixth nerve is so great and also the third. When he looks far to the left he sees double and if he looks upward he does the same. He had a very definite injury at the side of his neck, a lacerated wound that has caused a scar. He has some difficulty in opening his mouth fully because of the temporal muscle that has become adhered to the bone. At first he was unable to open his mouth at all but because of constant exercise he is now able to open it about two-thirds of normal. That is due to a restricted muscle on the left side of the head. He has a scar on the left elbow and limitation of movement of the left elbow and left arm and hand, a trifle weaker than the right."

Speaking of the future treatment of the case, Dr. Fleming testified: "The contemplated operation is one to fill in a defect in the left frontal region. He has a depression there and from a cosmetic point of view it would be important to correct that, but the more important thing is to cut down the adhesions. The thing to do will be to graft down a bone in there and give protection. That operation will be to incise the scar at the scalp wound and turn back healthy scalp and

muscle and freshen up the edges of the bone, cut down the adhesions between the brain itself and the dura, and then take several pieces of bone from his leg and fit those over the defect in such a way that it will fill the defect in and put a layer of bone between the brain and the scalp to give him further protection from injury. The pieces of bone will be taken from the anterior portion of the tibia. The particular place to cover is about two and one-half inches long." Dr. Allen testified that in his opinion the patient will never be fit to perform the functions of an officer in the navy. "Although he has made a very good recovery to date, I feel there may be further deterioration of his mental powers and also the possibility of epilepsy comes up. . . . I did not know the patient prior to the time of his accident but I would feel that his mental concentration is not as good as it was."

At the time of the accident the plaintiff was an officer in the navy, he was injured in line of duty and his medical bills were paid by the navy. He was receiving $273 per month but in the following June his class was promoted and at the time of the trial he was receiving $330 per month. His life expectancy is 32½ years. Instead of being promoted he is to be retired. When he is discharged from the hospital then his pay will be only $100 per month. Based on the pay of a senior grade lieutenant his actual financial loss is $89,700 without giving any consideration to the probability of further promotions with increasing base pay and allowances, nor to the fact that an officer's pay is automatically increased five per cent of the base pay for each three years of service up to thirty years.

█ In support of their attack on the verdict the defendants argue that the future damages are those only which "are reasonably certain to result". (*Silvester* v. *Scanlan*, 136 Cal. App. 107, 111 [28 Pac. (2d) 97].) They then quote the experts. Dr. Fleming testified as to the future. Among other things, he said: "Although he (the plaintiff) has made a very good recovery to date, I *feel* there *may* be further deterioration of his mental powers and also the *possibility* of epilepsy comes up. I would think there is some mental deterioration that cannot be repaired. I did not know the patient prior to the time of his accident, but I would *feel* that his mental concentration is not as good as it was.

Epilepsy is *likely* to follow a condition of this kind *quite often*. A man who has had a loss of brain substance and there has been damage to the brain caused by adhesions, it develops definite pressure on the brain and we know that oftentimes epilepsy follows.'' The defendants emphasize the words which we have italicized and then they argue: '' . . . no doctor essayed to testify that he would have epilepsy or any definite mental impairment, the only thing at all of this character being the above-mentioned speculation that he might''. But none of the evidence quoted was objected to. No ruling was asked of or made by the trial court. Defendants introduced no evidence rebutting the above excerpts. Under these circumstances we think the provisions of section 3283 of the Civil Code were complied with.

■ They also contend there is no competent testimony that the plaintiff will be retired or when. The record made was this. The plaintiff's wife was called by him as a witness. On cross-examination she testified: ''Lieutenant McDonald has not been retired as yet, but he will be no doubt.'' Thereupon the plaintiff stipulated, and the stipulation was accepted, that while the plaintiff is under hospital attention he has been. receiving his full pay as lieutenant junior grade and will continue to receive his full pay until the medical men are through with him. To Mrs. McDonald's testimony there was no objection or exception. It may have been incompetent but the record does not clearly show the fact. But, assuming it was incompetent, the objection thereto may not be made for the first time in this court. (*Sanders* v. *Austin,* 180 Cal. 664, 666 [182 Pac. 449].)

■ In this same connection it is said there is no competent testimony that plaintiff has sustained, or will hereafter sustain, any monetary damage. Assuming, solely for the purposes of this case, that such is the fact, the contention does not materially assist these defendants. In weighing the amount of the verdict the jury was considering two separate factors. The plaintiff was a naval officer under pay and entitled to draw some pay until his death. In so far as such compensation should be lessened by reason of his accident his damage could or would be increased in large sums. Turning from the factor of salary to the physical injury which he sustained, and speaking solely regarding that physical injury,

the jury was entitled to bring in a verdict amounting to a large sum. From the record before us we are unable to ascertain to what extent the jury based its verdict on the physical injury and to what extent, if any, on the loss of emoluments in the future. Under these circumstances we think it may not be said the record before us shows that any act or ruling of the trial court has resulted in a miscarriage of justice.

The judgment against the Standard Gas Engine Company is reversed and that defendant will have judgment against the plaintiff for its costs. The judgment against the other defendants is affirmed and the plaintiff will have judgment against those defendants for his costs.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 22, 1935, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 19, 1935.