[Civ. No. 3535. Fourth Dist. Feb. 3, 1947.]

Estate of MILDRED BABE McDANIEL, Deceased. GERTRUDE MARIE MORRELL et al., Appellants, v. JIMMIE SEUIS, as Executor, etc., Respondent.

Jamison & Jamison and Max B. Jamison for Appellants.

H. S. Millspaugh and Gaylord N. Hubler for Respondent.

GRIFFIN, J.—The holographic will of Mrs. Mildred Babe McDaniel, a widow, deceased, dated January 29, 1944, was admitted to probate on February 13, 1945. The will recited that she first directed the payment of her just debts. Then she bequeathed her residence, including all furniture therein and $1,000 to J. W. Seuis; $300 to a Mrs. Fleharty, and the residue went to her named sisters. Seuis was nominated executor to act without bond. The petition to probate the will alleged her property to be of the approximate value of $5,000. Mrs. Morrell, a sister of deceased, and one of the devisees herein, testified that the house and furniture were

bequeathed to the five daughters by their mother, and that Mrs. McDaniel purchased all of the interests except Mrs. Morrell's.

The amended petition contesting the will after probate, alleges that the will should be revoked on two grounds: (1) That Mrs. McDaniel was not, at the time of its execution, of sound and disposing mind; (2) that she was then "acting wholly under the influence and duress of Jimmie Seuis." These allegations were denied generally by defendant. A jury trial was demanded. After plaintiffs had produced all of their evidence, counsel for defendant moved for a nonsuit in the following language:

". . . the respondent moves the court for a nonsuit on the grounds that the contestants have failed utterly to make out any case or to prove any material allegations required to prove —the case of undue influence warranting the invalidation of a will."

The trial judge, in the absence of the jury, orally reviewed the evidence produced by plaintiffs and at the conclusion thereof he stated:

"There is absolutely no evidence upon what occurred at the time of her executing this will . . . there is absolutely no evidence as to any mental upset other than agitation and nervousness—no loss of mental faculties; in fact, she lived a year after the will was executed. . . . As Mr. Seuis said, he never saw the will until he saw it in Mr. Millspaugh's office, and there is no testimony or anything to show that he dominated her, or exercised an undue control over her power of volition at the time the will was executed. For these reasons, I think that the motion for a nonsuit must be granted, and it is so ordered. Mr. Bailiff, call in the jury."

He then told the jury:

". . . the court has just made a ruling which means you may take a longer adjournment. It has granted a motion for a nonsuit because of the fact that the court thinks there has been no testimony presented which shows a control of the volition of the decedent—the testatrix at the time she executed her will more than a year before she died. For that reason, this motion for a nonsuit has been granted, and the court is of the opinion that there has not been a proper showing, or any showing of undue influence at the time the testatrix actually performed the testamentary act, so there will be no

longer any necessity for you to hear any more of the evidence.''

■ Plaintiffs now claim (1) that the motion for nonsuit was not sufficient in form because it was directed only to plaintiffs' second cause of action, i. e. undue influence, and did not mention the first cause of action, i. e., unsound mind, and argue that it is error to grant a motion for nonsuit when the grounds thereof are not stated, where several causes of action are stated; and that the motion must show wherein plaintiffs failed to prove their case. (Citing 9 Cal.Jur. p. 548, § 33, and such cases as *Scott* v. *Sciaroni*, 66 Cal.App. 577 [226 P. 827] ; *Masero* v. *Bessolo*, 87 Cal.App. 262 [262 P. 61] ; and *Dawson* v. *Tulare Union High School*, 98 Cal.App. 138 [276 P. 424].)

It is contended that under the foregoing decisions they are entitled to a reversal of the judgment of nonsuit as far as it pertains to the first cause of action because that ground (unsound mind) was not included in the motion.

Counsel for defendant concedes the general rule set forth in 9 California Jurisprudence page 548, section 33, but cites the exception set down to the general rule in *Estate of Higgins*, 156 Cal. 257 [104 P. 6], and followed in *Gursky* v. *Rosenberg*, 105 Cal.App. 410 [287 P. 575].

From a mere reading of the motion, ruling, and instruction to the jury, it appears to us that there was little doubt, if any, in the mind of counsel for plaintiffs that the ruling included both claimed grounds specified in the amended petition. The grounds stated and rulings thereon were equivalent to a statement by the trial judge that the plaintiff had failed to prove a single allegation of his grounds of contest. (See *Carter, Administrator* v. *Hopkins*, 79 Cal. 82 [21 P. 549], where it was said:

''The grounds on which the nonsuit was asked were sufficiently stated. They are equivalent to the statement that the plaintiff had failed to prove a single allegation of his complaint. The plaintiff's attorney, no doubt, understood what was meant by the attorney for the defendants, viz., that the plaintiff had not proved a single material allegation of the complaint. We cannot say that the nonsuit was erroneously granted, for the reason that the grounds on which it was asked were not stated with the precision and definiteness that the law required.'' (See, also, *Johnson, Administrator* v.

*Southern California Edison Co.,* 27 Cal.App. 425 [150 P. 656].)

■ Even assuming that there is merit to plaintiffs' technical argument, the action of the trial court is without prejudice where plaintiffs have totally failed to make out a case on the grounds alleged and the defect is incurable, and where there is no evidence which would support a favorable finding on that ground. (*Ford* v. *Evans,* 29 Cal.App.2d 623 [85 P.2d 214] ; *Gursky* v. *Rosenberg, supra; Estate of Higgins, supra.*)

We will therefore consider this question along with the question whether the evidence produced upon the material points to be proved, indulging in every legitimate inference, disregarding conflicting testimony, and viewing it in its most favorable aspect, was substantially sufficient to support a verdict in plaintiffs' favor. (*Perera* v. *Panama-Pacific Int. Exp. Co.,* 179 Cal. 63 [175 P. 454] ; 9 Cal.Jur. p. 554, § 36.) Counsel for plaintiffs does not set out in his brief, nor refer us to any substantial evidence that would support a judgment in plaintiffs' favor. (*Mountain Tunnel Gravel Mining Co.* v. *Bryan,* 111 Cal. 36 [43 P. 410].) However, we have read the entire record and have come to the same conclusion reached by the trial court.

■ We will recite a brief résumé of the evidence. Mr. Seuis was called under section 2055 of the Code of Civil Procedure and testified generally that he first met Mrs. McDaniel, referred to as "Babe," in 1936 in San Francisco; that she lived at Lindsay; that she weighed about 165 pounds, was 5 ft. 3 inches tall and about 40 years of age; that she had the use of one eye only and had been employed as a telephone operator for nearly 20 years; that he was at that time separated from his wife; that he came to Lindsay to live in September, 1937; that he was unable to work and resided for three months at the home of Mrs. Hershberger, mother of Babe; that he moved out of those premises and worked around at several places as a bartender; that his wife divorced him and the decree became final in May, 1937; that Mrs. Hershberger died in December, 1938; that he and Mrs. McDaniel planned on being married; that he gave her what he earned; that Mrs. Morrell, sister of Babe, was living at Babe's home; that Mrs. Morrell had him arrested "about taking a stove" but that he did not take it and that he and Babe went down and told the judge what happened and there was no charge made; that he stayed away from the home for a while; that

the other sisters told him he could go back and that "if Babe couldn't have her boy friends, neither could Mrs. Morrell"; that Babe had a safe deposit box in her own name; that she was taken ill and although she was nervous and upset, her mental condition was "as sound as anyone"; that on January 15, 1944, the doctor informed her she had cancer. About January 29, 1944, she wrote the will here in question. He then testified that he remained in her home and cared for her until she was taken to the hospital; that he did not have access to her safe deposit box; that he never talked to her about making a will and that on January 26, 1945, nearly one year after making the will, Mrs. McDaniel died in the hospital; that he was not present; that a few days before her death she had him take some papers she had at the hospital to her attorney, Mr. Millspaugh.

A Mr. Matthewson testified that he visited in the home of deceased about January 30, 1944, about the date of making the will, and that Babe was "awful unrestful"; that she told him she had cancer; that Seuis was present and had an argument with Babe about a cooler; that later in the hospital, about a week before her death, he had a conversation with Seuis and he stated to him that he (Seuis) wanted to marry Babe but she wouldn't do it.

Mrs. Blanch Holmes testified that she knew all of the parties mentioned; that about January 8, 1939, she visited the home and Babe had bruises on her neck; that she asked her how it happened and she remarked "a friend of hers gave it to her," and she (Mrs. Holmes) remarked: "I would sure stand that guy on his ear," and she said: "Not if you were in my shoes you wouldn't"; that Mr. Seuis was very attentive around Babe; that after Babe found that she had cancer she was very "nervous—very upset—she couldn't keep her mind off of it, which was natural, I guess."

Gertrude Morrell testified that she was called to Lindsay on December 24, 1938, and had lived with Babe ever since; that Seuis came to live with Babe and her mother in August, 1937, and at the request of her mother he left in November of that year because she did not want to support him; that he did not live there again until February 28, 1944, but was "in and out a lot"; that her sister worked up until the day the doctor told her of her condition, and that her health was "very poorly" and continued so until her death; that on January 30, 1944, Babe called her at Antioch about the

doctor's report of cancer and discussed with her whether she should have an operation or take radium; that on her return to Lindsay Babe was "very excitable"; that she would start to say something and she would not finish the conversation; that she would say: "I don't know what I want to do. I don't know whether I want to do that or not"; that she "didn't sleep very good" and had taken medicine for that; that in December, 1938, three weeks after the death of the mother, Seuis came to the home and after one hour "Babe came through the hall, screaming, and said 'Gertrude—Gertrude—' Jimmie was there and he wouldn't go home"; that he had choked her and tried to force her to marry him; that she, Mrs. Morrell, had Seuis arrested and the judge told Seuis not to come to the house "for a long time"; that he came anyway when she was away; that Seuis would "dominate over her and she seemed to do whatever he said or suggested"; that on January 29, 1944, in her opinion, Babe was not "in any condition of mind to make a will . . . she was too excited . . . very highly nervous"; that on January 31, 1944, she called Mr. Millspaugh to locate Babe and she was there consulting with him about making a will; that Babe told her that evening at home that she had made a will and that nobody else was with her that evening. Plaintiffs then offered in evidence, over objection, a certified copy of the Justice's Court docket in reference to the charge made against Seuis by Mrs. Morrell. Although it shows a plea of guilty to the charge of disturbing the peace and remission of a $25 fine conditioned that Seuis remain away from the Hershberger home for three months, it adds no force to the evidence already received on the subject.

At the conclusion of this evidence counsel for plaintiff announced: "That is all the testimony" and rested his case. The court then granted the motion for nonsuit.

It can be readily observed that there was no evidence that would support a verdict that Mrs. McDaniel was of *unsound mind* at the time she made her will. In fact, all of the evidence indicates otherwise. Plaintiff does not argue that question in his brief. The evidence bearing on the question of duress or undue influence of Seuis upon Mrs. McDaniel, in making her will, if any, is purely a matter of conjecture, very slight, and falls far short of being that substantial evidence necessary to support a verdict in favor of plaintiffs. It does not affirmatively appear that the actions and conduct of

Seuis, in relation to the will, was such as would convince any reasonable person that the will, as prepared, was not the will of the deceased and as she intended it to be, or that Seuis coerced her to execute it and thereby substitute his will for the will of the deceased, as alleged. The will was made nearly one year prior to her death. She had plenty of time to reflect upon any change in it she may have desired. She apparently had independent legal advice and the will is couched in legal form. All of her immediate relatives were remembered in the will, but maybe not to the extent they had probably contemplated. There is no evidence that defendant ever knew Babe was making a will or had made a will until the will was turned over to him in the attorney's office after her death. While there may have been plans for their marriage, there was no evidence that would establish a confidential relationship sufficient to create any presumption of undue influence and that the beneficiary unduly profited by the will and actually participated in procuring its execution. (*Estate of Burns*, 26 Cal.App.2d 741 [80 P.2d 77].) The case of *Azevedo* v. *Leavitt*, 76 Cal.App.2d 321 [172 P.2d 704], has no application to the facts related in the instant case.

The evidence of defendant's arrest and conduct in 1938, or January, 1939, if material or competent, was too remote to add any weight to the question of undue influence at the time of the making of the will in 1944. ■ The undue influence invalidating a will must be such as destroys free agency, constraining the testator at the time the will is made to make a disposition of her estate contrary to and different from that which she would have done if she had been left to the free exercise of her own inclination or judgment. An undue influence which will affect a testamentary act must be such influence operating upon the very act itself; an influence exerted and used prior to or at the time of the making of the will and of which the will is the product. (*Estate of Ricks*, 160 Cal. 450 [117 P. 532].)

In *In re Kaufman*, 117 Cal. 288, at page 295 [49 P. 192, 59 Am.St.Rep. 179], it is said:

"The undue influence which will avoid a will must be such as operates upon the mind of the testator at the time of making the will, and must be an influence *relating to the will itself.*" And quoting from another case, said: "Unless there was some evidence tending legitimately to prove that some fraud had been practiced upon the testatrix at that time, or

that some misrepresentation had then been made, or that some physical or moral coercion had been employed, such as to destroy her free agency, the court erred in submitting to the jury the question whether undue influence had been exerted. It was inviting them to find as a fact that of which there was no evidence, and which the law as well as reason presumed had no existence.''

The right of absolute dominion over one's property is sacred and inviolable, and whatever may be one's motives in making disposition of his property by will, his will in the disposition of that property is paramount. (*Clapp* v. *Fullerton,* 34 N.Y. 190 [90 Am.Dec. 681].) See, also, *Estate of King,* 63 Cal.App.2d 365 [146 P.2d 952]; *Estate of Arnold,* 16 Cal.2d 573 [107 P.2d 25]. The order granting the nonsuit was proper.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.