[Civ. No. 13783.  First Dist., Div. One.  Aug. 10, 1949.]

SIGMUND PFINGST, Appellant, v. JOSEPH MAYER
et al., Respondents.

Emmett R. Burns and Frank W. Prideau, Jr., for Appellant.

Charles V. Barfield, Franklin A. Plank, Leo V. Killion and Hoge, Pelton & Gunther for Respondents.

PETERS, P. J.—Appellant, Sigmund Pfingst, was seriously injured when he fell down an elevator shaft of the Marwedel Building located on First Street between Market and Mission Streets, San Francisco. He brought this action

against C. W. Marwedel, owner of the building, Joseph Mayer, a tenant, and the Otis Elevator Company, a corporation engaged in the business of repairing and servicing elevators and who had entered into a "service contract" with Mayer to grease and oil the elevator in the building periodically, and to render other minor routine services. At the time of the accident Pfingst was performing services gratuitously for Mayer. The trial court granted a nonsuit in favor of the Otis Elevator Company, and a directed verdict in favor of Marwedel. The jury rendered a verdict in favor of Mayer, but the trial court granted a new trial as to him on the ground of insufficiency of the evidence. Pfingst appeals from the orders and judgment based thereon in favor of Otis and Marwedel. Mayer has not appealed from the order granting the new trial, so that the propriety of that order is not here involved.

The accident occurred on April 29, 1944. The First Street entrance of the Marwedel Building, which was the entrance used by appellant on the day of the accident, has two swinging doors with glass panels. The hallway from the street to the elevator is from 12 to 20 feet long, and, according to the testimony of appellant, was sufficiently illuminated by natural or artificial light to enable him to see "all right" at the time the accident occurred.

There are six floors in the building. The first floor consists of a hallway, a store occupied by a photographic service, and the entrance to the elevator. The second, third, fourth and fifth floors were rented to various tenants who used them for storage space. These tenants used a freight elevator in another part of the building and did not use the passenger elevator. The passenger elevator here involved stopped only on the first and sixth floors, as the doors leading to the other floors had been locked by Otis, acting upon the orders of Marwedel, shortly after January 1, 1944, when Mayer began occupancy under his lease. Thus, Mayer and his business guests and employees were the only persons to use the passenger elevator.

Mayer leased the sixth floor from Marwedel on December 30, 1943, and thereafter conducted there a uniform tailoring business. His main place of business, a retail store where naval uniforms were sold, was directly across the street from the Marwedel building. After a sale was made at the retail store, the uniforms were sent to the tailoring shop in the Marwedel building for alterations and pressing.

The rental agreement between Marwedel and Mayer contained the following paragraph: "J. J. Mayer is hereby granted permission to use the passenger elevator but he must maintain Otis Elevator service and inspection and pay necessary expenses for putting the elevator into service, repair and maintenance as well as carrying all necessary insurance to protect C. W. Marwedel from any and all liability."

The elevator was an old type manually operated Otis passenger elevator, known as an electric basement drum elevator. It had no automatic controls and could only be moved by operating a control lever from within the cage. Normally, it could be raised or lowered only when the doors on all floors were tightly closed. However, within the cage there was an emergency button, required by law to be covered by a glass plate, which could be used to move the elevator when all doors were not closed. In order to move the machine in this manner, it was necessary for the operator to break the glass plate and to keep the emergency button depressed with one hand while he operated the control lever with the other. Frequently, when the elevator was not in use, the outer door at the floor where the elevator was resting (there was no inner door or gate) would close. If this occurred while the elevator was at the ground floor, the only means of entering was to reach through the grillwork of the door and lift the latch from the inside. However, the door on the sixth floor was solid glass, and if it closed while the elevator was there, the only means of gaining access was to lower the elevator to the first floor by manipulating the jacks in the basement and then to open the first floor door in the manner above described.

About a month before the accident, Mayer had been notified by the Industrial Accident Commission that a guard plate should be installed on the first floor door in order to make it impossible to open the door by extending an arm through the grille. This plate was installed and was in place at the time the accident occurred. Thereafter, in order to gain access to the elevator when the door had closed, Mayer's employees made hook devices from wire coat hangers which enabled them to reach over the protective plate and "pick the lock," and thus release the door latch from the inside. Mayer testified that he destroyed these hooks whenever he found them because he had been warned by the Otis servicemen of the danger inherent in having such devices accessible to persons desiring to use the elevator. However, such a hook was found hanging on the

wall of the ground floor hallway immediately after the accident by an insurance investigator.

There was evidence that several state safety laws governing elevator operation had been violated. Thus, the regulation requiring that an elevator operating at the speed of this one (200 feet per minute) must be manned by a regular operator had not been complied with, and Mayer had failed to secure a permit from the Industrial Accident Commission to operate the elevator as required by law. In addition, several witnesses testified that at the time of, and for some time preceding the accident, there had been no glass plate covering the emergency button. Although a light should have been burning inside the elevator during the hours it was in use, appellant testified that it was not burning on the day of the accident. An employee of Mayer testified that the elevator was often without light.

Several witnesses who had been, or were, employees of Mayer testified that there had been constant trouble with the elevator. It often stuck between floors, and Mayer would have to manipulate the jacks in the basement in order to free it. A witness who had, for a short time, been employed by Mayer to operate the elevator, testified that the traffic in the street caused vibrations which often closed the elevator doors, and also caused the elevator to drop several feet after it had been brought to a stop. Another employee testified that something went wrong with the elevator almost every day, sometimes several times a day.

At the time Mayer began occupancy under the lease, the elevator had been in disuse for six or seven years. When Mayer signed the lease, Otis was ordered to put the elevator in running condition, and this was done. At that time Mayer was informed by Otis that certain work would have to be performed on the elevator before Otis could give him a ''maintenance contract,'' which would have entitled him, for a five-year period, to receive complete service, including the repair and replacement of worn-out parts. Mayer refused to authorize this work which would have cost him approximately $500. It should be noted that there is uncontradicted evidence that the performance of this work was not necessary for the safe operation of the elevator. Grimes, a safety engineer and elevator inspector for the Industrial Accident Commission, who inspected the elevator three days after the accident occurred, testified that the general condition of the elevator was

good, and that it was safe to operate. Similar testimony was given by Van Raam, the service salesman of Otis who gave the original estimate on the recommended work. Although Mayer refused to sign a "maintenance contract" with Otis, he did enter into a "service contract" with that company, under the terms of which Otis agreed to grease and oil the machine regularly, make minor adjustments, and furnish minor supplies.

Appellant had contracted with Mayer to embroider the name of the purchaser into any uniforms Mayer sold, the charge for this service to be divided between them. On the afternoon of the accident, appellant was embroidering in Mayer's retail store when Mayer telephoned him from the tailor shop in the Marwedel building and asked him to come over and run the elevator for a few minutes. Appellant had done this several times before as a favor to Mayer and had never been paid for such work. He went over to the Marwedel Building and waited on the sixth floor for his services as elevator operator to be needed. Within a few minutes, Mayer asked him to return to the retail store and bring back some suits for pressing. Appellant took the elevator to the ground floor, left the elevator door open, crossed the street, picked up the suits, recrossed the street and stepped through the open elevator door. The elevator was no longer there, someone having taken it to the sixth floor, leaving the ground floor door open, and appellant fell some 12 feet to the bottom of the shaft. As a result of this fall he suffered severe injuries.

Before directly discussing appellant's contentions on these appeals, it should be noted that his opening brief violates rule 15(a) of the Rules on Appeal. The reporter's transcript comprises 1,247 pages, and nowhere in appellant's "Statement of Facts" has he given a single transcript reference. Rule 15(a) requires that: "The statement of any matter in the record shall be supported by appropriate reference to the record." This failure to comply with the rule has imposed an unnecessary burden on this court. However, in the interests of justice, the court has determined not to exercise the power granted by rule 18 to reject the improperly prepared brief, but to consider the appeal on its merits.

As already pointed out, these are appeals from orders granting a nonsuit as to one respondent and a directed verdict in favor of the other. Such orders may be granted "only when, disregarding conflicting evidence, and giving to plain-

tiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff'' if such a verdict were given. (*Estate of Green*, 25 Cal.2d 535, 546 [154 P.2d 692] ; *Perera* v. *Panama-Pacific Int. Exp. Co.*, 179 Cal. 63 [175 P. 454] ; *Estate of Caspar*, 172 Cal. 147, 150 [155 P. 631] ; *Estate of McDaniel*, 77 Cal.App.2d 877, 881 [176 P.2d 952].)   With these rules in mind, we pass now to a discussion of the points raised by appellant.

### PROPRIETY OF THE NONSUIT IN FAVOR OF OTIS ELEVATOR COMPANY

■   The theory of appellant is that Otis, knowing that certain work was necessary to put the elevator in perfect condition, was guilty of negligence in servicing it and allowing it to operate before such work was done. It may be conceded that there is evidence that in some respects this elevator was maintained in a defective condition, but there is no evidence at all that such negligence was the proximate cause of the accident.   The evidence shows that the accident happened because someone moved the elevator from the first to the sixth floor and left the ground floor door open.   Even if Otis were negligent in servicing a defective elevator, and all the evidence on this issue is to the effect that Otis was not negligent in this respect, there is not one word of testimony that indicates that any act of Otis, negligent or otherwise, was or could have been a proximate cause of the accident. There is no evidence that the work which Otis contracted to perform under the ''service contract'' was performed negligently.   Neither is there any evidence that Otis failed to perform its duties under the contract, or that any such neglect contributed in any way toward the accident. There is no evidence that the accident was caused by the failure to perform the work recommended by Otis at the time Mayer began his occupancy under the lease.   On the contrary, the testimony of Van Raam was to the effect that this work would have put the elevator in ''perfect running condition,'' but even without this work the elevator was in ''good running condition'' and could be operated safely. This was confirmed by the testimony of Grimes, the safety inspector for the Industrial Accident Commission. The testimony of appellant's witnesses was that the elevator frequently stuck between floors, and occasionally dropped a foot or two. How-

ever, there was no evidence from which it might be inferred that this faulty condition could have caused the accident which resulted in appellant's injuries. It is apparent that the elevator was moved by some other person after appellant left the building and before he returned. At the moment the accident occurred, the elevator was on the sixth floor. There is nothing in the record to indicate that the mechanical defects, if any, of the elevator were such as to enable it to rise without human intervention. In fact, all of the witnesses agreed that the elevator could not be moved while any of the doors were open unless the emergency button was depressed.

Appellant has presented no evidence from which it might reasonably be inferred that the accident was proximately caused by negligence on the part of respondent Otis. Therefore, the case of *Dahms* v. *General Elevator Co.*, 214 Cal. 733 [7 P.2d 1013], upon which he relies, is not in point.

### The Propriety of the Directed Verdict in Favor of C. W. Marwedel

The general principles governing the liability of a landlord to third persons may be briefly summarized as follows:

Although a landlord is generally held not responsible for the negligence of his tenant when an injury to third persons occurs on the tenant's premises (15 Cal.Jur. § 145, p. 734; 150 A.L.R. 1373), an exception to this rule occurs when the injury is suffered on a portion of the premises over which the landlord has retained control. (*Johnston* v. *De La Guerra Properties, Inc.*, 28 Cal.2d 394, 399 [170 P.2d 5]; *Hamilton* v. *Union Public Market*, 15 Cal.App.2d 340 [59 P.2d 459]; *Spore* v. *Washington*, 96 Cal.App. 345 [274 P. 407]; *Hull* v. *Bishop-Stoddard Cafeteria*, 238 Iowa 650 [26 N.W.2d 429]; 15 Cal.Jur. § 153, p. 741; 58 A.L.R. 1411, 1412.) But where the landlord has relinquished all control over the property he is generally not held liable for injuries suffered by third persons. (*Starr* v. *Sperry*, 184 Iowa 540 [167 N.W. 531]; *Lake* v. *Emigh*, —— Mont. —— [190 P.2d 550, 567]. See, also, Restatement of the Law of Torts, §§ 355 to 362 for the general rule and exceptions.) In reference to elevator accidents, it is the general rule that the person in control is liable for injuries caused by negligent maintenance or operation. The rule has been stated as follows: ''The person or corporation in possession and control of the operation of an elevator is the one liable for injuries resulting from negli-

gence in its construction or operation." (10 Cal.Jur. § 13, p. 224.) "If the tenant has the sole control and management of an elevator in a leased building, he, not the landlord, must give warning and look out for the safety of the persons whom he invites to use the elevator." (18 Am.Jur. § 27, p. 539.) "A lessee in possession, and not the landlord, is liable for injuries sustained by an invitee by reason of the negligent maintenance or operation of an elevator." (36 C.J. 246. See, also, 52 C.J.S. 37.)

So far as this respondent is concerned, the question before us is whether or not it may reasonably be inferred that the landlord retained any control over the maintenance and operation of the elevator. The evidence demonstrates that no such inference is permissible. In the first place, as already pointed out, the rental agreement between Marwedel and Mayer contained the following clause: "J. J. Mayer is hereby granted permission to use the passenger elevator but he must maintain Otis Elevator service and inspection and pay necessary expenses for putting the elevator into service, repair and maintenance as well as carrying all necessary insurance to protect C. W. Marwedel from any and all liability." It is true, as appellant argues, that the phrase "permission to use" does not necessarily indicate the relinquishment of all control by Marwedel. However, the phrase cannot be construed apart from the general context (Civ. Code, § 1641). Other statutory rules of construction that must be kept in mind are that: "Particular clauses of a contract are subordinate to its general intent" (Civ. Code, § 1650); words inconsistent with the general nature and intent of the parties are to be rejected (Civ. Code, § 1653); and, where the meaning of a particular phrase is uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it (Civ. Code, § 1649).

If these principles be applied to the contract before us, there is no doubt that Mayer contracted for and received exclusive use of the elevator, and not a mere "permission" to use it.

Under the terms of the agreement, Mayer was bound to pay all expenses involved in maintenance, repair, service and inspection, as well as insurance sufficient to cover any possible liability of Marwedel. It can hardly be inferred that he would have agreed to such a provision had there been an understanding between the parties that he was to share the control of

the elevator with Marwedel. If there were any doubt as to the meaning of the contract on this question, which there is not, such doubt would be dispelled by the parties' own interpretation of the contract as revealed in the conduct of the parties after its execution. Shortly after Mayer began his tenancy, the elevator doors leading to all floors not used by him were padlocked on Marwedel's orders. Thus, all other tenants were prevented from making use of the elevator. In addition, Mayer testified, and there is no contradictory evidence, that he "was to be the only one to use it." The evidence of Mayer and several other witnesses is that in fact no other tenants did use this elevator.

The action of the trial court in directing a verdict was therefore a proper application of the rule expressed in *O'Connor* v. *West Sacramento Co.*, 189 Cal. 7, at page 18 [207 P. 527], where the court said: "If the facts and circumstances to be considered in the interpretation of the contract are undisputed, there is nothing to submit to the jury and the court must direct a verdict in accordance with the construction placed on the contract by the court in the light of the admitted circumstances." Upon undisputed facts a contract must be construed by the court. (*Huebotter* v. *Follett*, 27 Cal.2d 765, 770 [167 P.2d 193].) From the undisputed facts in this case, it is clear that no reasonable mind could draw the conclusion that Marwedel had retained any control over the elevator, and therefore it was proper for the court to have withdrawn from the jury the question of exclusive control, and directed a verdict in Marwedel's favor. (24 Cal.Jur. § 65, 783 at p. 785, and cases cited.)

In opposition to this undisputed evidence, appellant contends that the evidence shows that after the lease was executed, Marwedel paid Otis for the installation of the guard plate on the ground floor door, and after the accident occurred Marwedel paid for the installation of a governor cable. From this, appellant argues that Marwedel had not relinquished control, but retained a control which carried with it an obligation to pay for repairs. Such an inference cannot be drawn in light of the certainty and unambiguity of the provision of the contract on this point. It is clear that these payments were made voluntarily by Marwedel, and that he was not bound to make them under the contract. It cannot reasonably be inferred that, paying these bills, Marwedel assumed a liability from which he was unqualifiedly protected by the written contract. The Massachusetts court

has stated: ''The making of repairs by a landlord from time to time in response to the request of a tenant does not constitute an admission of responsibility on the part of the landlord. These are gratuitous acts which do not impose continuous liability.'' (*Conahan* v. *Fisher*, 233 Mass. 234 [124 N.E. 13 at p. 14]. See, also, *Andrews* v. *Leominster Savings Bank*, 296 Mass. 67 [5 N.E.2d 50]; 150 A.L.R. 1373 at p. 1383.)

Appellant urges, however, that even if Marwedel was not in control of the elevator, he is nevertheless liable for appellant's injuries. The argument is unsound. If it be assumed that Mayer was guilty of negligence, there is no principle of law by which Marwedel, the landlord who was not in control of the premises, can or should be held liable. Such a holding would be contrary to the many cases generally holding that in the absence of fraud or deceit on the part of the landlord in concealing latent defects of which he has knowledge, and in the absence of a direct covenant to make repairs, the lessor is not liable to the tenant or others for injuries resulting from defects in the rented premises. (*Rider* v. *Clark*, 132 Cal. 382 [64 P. 564]; *O'Leary* v. *Herbert*, 5 Cal.2d 416 [55 P.2d 834]; *Mundt* v. *Nowlin*, 44 Cal.App.2d 414 [112 P.2d 782]; *Shell Oil Co.* v. *Richter*, 52 Cal.App.2d 164 [125 P.2d 930]; *Lippman* v. *Subway Terminal Corp.*, 115 Cal.App. 363 [1 P.2d 1056]; *Nelson* v. *Myers*, 94 Cal.App. 66 [270 P. 719].)

Appellant also contends that Marwedel was negligent in not maintaining proper lighting facilities in the hallway leading from the street to the elevator. Appellant's own testimony was that at the time he entered the hallway, he could see ''all right.'' The record thus reveals no evidence from which negligence on the part of Marwedel may be inferred.

The other contentions of appellant are so unsubstantial as not to require discussion.

The orders of the trial court granting a nonsuit in favor of respondent Otis Elevator Company, and directing a verdict in favor of respondent C. W. Marwedel, and the judgment based thereon, are affirmed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied September 8, 1949, and appellant's petition for a hearing by the Supreme Court was denied September 29, 1949.