[Civ. No. 16967. First Dist., Div. One. Feb. 7, 1957.]

LeROY SCHWERDTFEGER, Appellant, v. STATE OF CALIFORNIA, Respondent.

Jarvis, Miller & Decker, Martin J. Jarvis, Hugh B. Miller and Charles W. Decker for Appellant.

Bledsoe, Smith, Cathcart, Johnson & Phelps and Wilbur J. Russ for Respondent.

PETERS, P. J.—Plaintiff, an employee of Marine Terminals Corporation, a company that has an agreement to occupy space on Pier 39 in San Francisco, was seriously injured while working in the course and scope of his employment on the pier. The pier is owned by the state. Plaintiff brought this action against the state, claiming that it owed him a duty of due care which had been violated. The jury brought in a defense verdict. Plaintiff appeals. His two major contentions are that the state law imposes such control over the situs and instrumentality of the injury that the state owed him a duty to use reasonable care to inspect the instrumentality causing the injury, and the place where

it occurred, or, independently of statute, under general principles, he was an invitee of the state to whom the state owed the duty of reasonable care to see to it that the premises were reasonably safe. The trial court refused to so instruct.

The case has been tried twice. The first trial resulted in a verdict for plaintiff, which was set aside on motion for a new trial. The second trial resulted in a defense verdict.

The state owns the land and pier in question. The ''possession and control'' of the pier are vested in the Board of State Harbor Commissioners for San Francisco Harbor. (Harb. & Nav. Code, §§ 1700, 1732.5, 1732.7, 1735, 1741, 1770, 1900, 1906, 1907, 3000, 3105, 3106.) The state engages in certain activities on the piers under its control. The Harbor Board is authorized to ''fix and regulate the rates of dockage, wharfage, cranage, tolls, rents and other charges.'' (Harb. & Nav. Code, § 3080.) It charges rent to the private businesses, such as Marine Terminals, that operate on its piers (Harb. & Nav. Code, §§ 3050-3064), and dockage (Harb. & Nav. Code, § 3081), and wharfage (Harb. & Nav. Code, §§ 3086, 3087). The board supervises the operation of these facilities and properties (Harb. & Nav. Code, § 1732.5), the construction, maintenance and repair of piers, and the erection of improvements necessary for the safe landing, loading and unloading of cargo and passengers passing into and out of San Francisco by water. (Harb. & Nav. Code, § 3000.) It also operates the State Belt Railroad, which has tracks on Pier 39, and sells electricity to ships berthing at any of the many piers under its jurisdiction. The port of San Francisco is a competitor with other ports through which cargo and passengers pass. One of the declared statutory purposes of these provisions is to aid in harbor development and trade promotion in this area. (See generally Harb. & Nav. Code, §§ 1906, 1980 et seq.)

Under these and related provisions the board has the power to license private businesses, such as Marine Terminals, to engage in certain activities on the piers under its jurisdiction. To this end the board is authorized to make rules and regulations ''concerning the control and management'' of the piers. (Harb. & Nav. Code, § 1900.) It may insure against loss or damage regarding its property or operations. (Harb. & Nav. Code, § 1902.) It fixes and collects all fees for the services and facilities provided by the state. It may impress a lien upon all goods stored upon its piers to secure the collection of its fees. (Harb. & Nav. Code, § 3100.) It may

require the removal of any goods or structures which constitute obstructions on the wharves and piers. (Harb. & Nav. Code, §§ 3101, 3106, 3107.) Through its chief wharfinger and through wharfingers assigned to each pier, the board regulates the movement of ships in the docks and harbor, guards against obstructions on the piers and preserves order and reports accidents. (Harb. & Nav. Code, §§ 1735, 1738.) Through its chief engineer, the board gives constant attention to the condition of the seawall, and to the thoroughfares, structures and wharves under its jurisdiction. (Harb. & Nav. Code, §§ 1740, 1741.) The board cannot "lease any premises under its control for any purpose," but the board "may permit any property under its control to be used by any person." (Harb. & Nav. Code, § 3061.) This section was derived from former Political Code, section 2524, which referred to this power as one to "set apart and assign" the property. Any such use permitted by the board may be terminated upon 30 days' notice. (Harb. & Nav. Code, § 3063.) By one of its duly adopted rules the board has the power to remove stevedores' tools and appliances from the wharves. (Rule 154a.) It is a conceded fact that a wharfinger employed by the state was present on Pier 39 daily not less than twice, and, on the average, four or five times. His duties were principally to assess charges and to preserve the state property under the jurisdiction of the board. He also investigated accidents, kept the piers free from obstructions, and generally supervised the piers.

Pier 39 has been rented to Marine Terminals by the state since 1945. Prior to that, Marine Terminals had operated the pier for the United States Army. Marine Terminals is both a terminal operator and a contracting stevedore. There are several provisions of the rental agreement to which reference should be made. Among other things, it provides:

"1. This assignment of space is a revocable license to use the same. The said license is revocable at the pleasure of the Board of State Harbor Commissioners for San Francisco Harbor. Payment of the above mentioned charges for space in advance is a condition precedent to the continuance of this license and the same may be revoked forthwith at any time when the payment of said charges is in default or when said premises are used in an unlawful manner, or for unlawful purposes. When the payment of said charges is not in default, said license may be revoked by either Assignor

or Assignee at any time, said revocation, however, to be effective thirty (30) days after notice in writing thereof. . . .

"10. Assignee shall permit Assignor and his agents to enter into and upon said premises at all reasonable times, and, in the event of an emergency, at any other time for the purpose of inspecting the same or for the purpose of maintaining, altering or repairing said premises, or if the premises be part of a building, then to maintain, alter or repair said building including the erection and maintenance of such scaffolding, canopies, fences and props as may be required, or for the purpose of posting notices of non-liability for alterations, additions, or repairs, or for the purpose of placing upon the property in which the said premises are located any usual or ordinary signs, or for fire or police purposes or to protect the premises from any cause whatever, without any rebate of assignment charges and without any liability on the part of Assignor for any loss of occupation or quiet enjoyment of the premises thereby occasioned.

"11. Assignee shall, at his sole cost, keep said premises and appurtenances and every part thereof, including glazing, sidewalks adjacent to said premises, any store front and the interior of the premises, in good and sanitary order and condition, . . .

"12. Assignee hereby accepts liability for any and all damage to said premises and appurtenances and every part thereof caused by assignee or his employees, by licensees or invitees of assignee, which occurs during the period of this assignment and Assignee agrees to notify Assignor of said damage within thirty (30) days thereof, and Assignee specifically agrees to either repair said damage or to compensate Assignor for the reasonable value of said damage or to compensate Assignor for the cost of repair thereof, at the election of Assignor.

"13. Assignee, as a material part of the consideration to be rendered to Assignor, hereby waives all claims against Assignor for damages to goods, wares and merchandise, in, upon or about said premises and for injuries to persons in or about said premises, from any cause arising at any time, and Assignee will hold Assignor exempt and harmless from any damage or injury to any person, or to the goods, wares and merchandise of any person, arising from the use of the premises by Assignee, or from the failure of Assignee to keep the premises in good condition and repair, as herein provided."

This assignment of space gave Marine Terminals physical possession of all of Pier 39. The state did not reserve any portion of the premises, nor did it impose specific instructions on the use of the pier. Marine Terminals was permitted to solicit its own business and to operate its premises in accordance with its needs. The state does not engage in stevedore or rigging operations, nor does it solicit business for any particular pier or tenant.

Since 1945 Marine Terminals has been the only assignee operating on Pier 39. It makes its own arrangements for the docking of ships and for the loading or unloading of cargo. It directed cargo placement and handling, and it routed over the pier any passengers from ships docking there. It maintained a 24-hour guard on the pier, and locked the gate leading to it at night. Neither the pier wharfinger nor any other state employee had a key to this gate. The general public was excluded from the pier. The board licenses strappers, weighers and stencilers, who, however, perform no services for the state. They seek employment from the pier operators such as Marine Terminals. The board operates the State Belt Railroad which is used by Marine Terminals in its operations. Tracks of this railroad are on Pier 39. Cars are delivered to Marine Terminals at its request. There is a door across the tracks at the end of the pier which is normally kept locked and only opened by an employee of Marine Terminals when cars are delivered to that company.

In addition to rent, the state receives a direct benefit from the operations of Marine Terminals, in that it collects demurrage on cargo after it has been on the pier for a stated period of time. These charges are based on books kept by Marine Terminals.

Appellant was the clerk supervisor of Marine Terminals on Pier 39, and, as such, directed the movement and placement of cargo on the pier. He occasionally supervised the rearranging of cargo which would result in the state collecting added demurrage.

The injury occurred on June 10, 1952, when an overhanging wire cable fell to the pier, carrying with it six suspended canvas tarpaulins. These tarpaulins weighed about 1,200 pounds each. When they fell, portions hit and seriously injured appellant who was then working in the course and scope of his employment with Marine Terminals. The heavy canvases were used when it rained, by the stevedores employed by Marine Terminals, as covers for the hatches of

ships. When not in use they were stored on the wire cable. They were the property of Marine Terminals.

The cable was installed by Marine Terminals when it first occupied the pier. It was rigged by running each end through an eye in a metal dog and clamping it back on itself by means of "U" clamps. The dogs were looped over two "I" beams which were integral parts of the pier. Marine Terminals' employees originally rigged the cable, and only Marine Terminals maintained and used the installation. After the accident, Marine Terminals removed the cable and its attachments and stored it in its gear shed.

There was expert testimony that the original installation of the cable was improperly made. Ordinary prudence would require inspection of the installation at least twice a year, and probably once a month. The defects in the installation were obvious and discoverable by a mere visual examination. Admittedly, neither the state's employees, nor Marine Terminals' employees, ever inspected the installation. The state's employees knew of the location and use of the cable. It was so located that it was exposed to vibration, caused by docking ships and operation of the Belt Line Railroad.

The assignment of space contract contained the following provision: "Assignee shall not make, or suffer to be made, any alterations or improvements of the said premises, or any part thereof, without the written consent of Assignor first had and obtained, and any additions to, or alterations of, the said premises, except movable furniture and trade fixtures, shall become at once a part of the realty and belong to Assignor."

At the inception of the case we are met with the contention by respondent that the state is insulated from any tort liability by the doctrine of sovereign immunity. If the operations by the state here involved are governmental in nature, the doctrine would apply, but if the operations are proprietary in nature the state is, of course, liable for its torts. (Gov. Code, § 16041.) In *Guidi* v. *State,* 41 Cal.2d 623 [262 P.2d 3], the court held that the state was acting in a proprietary capacity when it entered into activities at the State Fair to amuse and entertain the public. The court held that these "activities of defendants do not differ from those of private enterprise in the entertainment industry." (P. 627.) It also stated (p. 625): "Governmental immunity, however, turns on the nature of the particular activity that leads to the plaintiff's injury, not on the identity of the

governmental subdivision or agency carrying on the activity, or on the fact that the facility in question may also be used for governmental purposes.'' (See also *Muses* v. *Housing Authority*, 83 Cal.App.2d 489 [189 P.2d 305].)

A case that is directly in point is *People* v. *Superior Court*, 29 Cal.2d 754 [178 P.2d 1, 40 A.L.R.2d 919], which held that the Board of Harbor Commissioners' operation of the State Belt Railroad was a proprietary function, and that the state was liable for torts growing out of the negligent operation of that railroad. The court rejected the argument that, due to the absence of the profit motive, the state was immune. The court stated (p. 763): ''The additional fact that the expense of operation, including damages for negligent operation, is primarily a burden on industry and commerce, and the fact that the business of transportation for hire is usually undertaken by private individuals or corporations and not by government, support the conclusion that the operation of the railroad is not in the exercise of a governmental function, but constitutes a commercial or business enterprise in the negligent operation of which the state may be held liable.''

In the instant case, the state's activities are admittedly in competition with private piers in Oakland. The operation of the railroad and the piers are similar in character and purpose.

Respondent places its main reliance on section 1906 of the Harbors and Navigation Code which forbids the board ''to exercise other than a governmental function in carrying out the purposes of this part.'' Of course, that same code specifies, in some detail, the functions, duties and operations of the board. ■ If those activities are proprietary in nature, the Legislature could not transform them to governmental functions by legislative mandate. It is, as already pointed out, the inherent nature of the activity that determines whether it is proprietary or governmental. Necessarily implicit in *People* v. *Superior Court, supra,* is the holding that section 1906 of the Harbor and Navigation Code is not controlling in passing on the question under discussion. ■ We think that the operations of the state are proprietary in nature, and that the state, in a proper case, is liable in tort for its own negligence.

The basic question involved on this appeal is whether the state owed appellant any duty of care, and, if so, what the extent and nature of that duty may have been. More specifically, did the state owe to appellant the duty to inspect the

instrumentality that caused the injury? If so, the uncontradicted evidence shows that the state failed to inspect. It should be mentioned that it is conceded that whatever duty, if any, that was owed appellant by the state, is nondelegable.

The status of Marine Terminals on the pier is somewhat equivocal. It could not be a lessee because the statute prohibited the state from leasing the piers. But the state was permitted to assign space. It assigned Pier 39 to Marine Terminals. Marine Terminals paid the state a fixed rent. Marine Terminals had the legal right to and did exclude the public from the pier. It had possession of the pier, and within the limits of control by the state, determined the activities on the pier and how they should be performed. But the state had certain activities on the pier, and its wharfinger visited the pier several times a day to see that those activities were carried out. Thus, the state was not exactly in the position of a landlord out of possession.

Appellant, the employee of Marine Terminals, argues that he was a business invitee of the state. He relies on the well-settled rule that ''An invitation will be implied when one visits the premises of another for a purpose which is of mutual benefit to both parties and not as the mere caprice or for the sole pleasure of the visitor.'' (*Strong* v. *Chronicle Pub. Co.*, 34 Cal.App.2d 335, 339 [93 P.2d 649].) He asserts that his activities as an employee of Marine Terminals were not only of benefit to the state in the conduct of its wharfinger business on the pier, but were indispensable to such business.

■ In California, the rule applicable to an invitor is that a duty is imposed on the person in possession of land as the price he must pay for the economic benefit he derives or expects to derive from the presence of the visitor. (*Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225 [282 P.2d 69]; *Saba* v. *Jacobs*, 130 Cal.App.2d 717 [279 P.2d 826]; *Fraters* v. *Keeling*, 20 Cal.App.2d 490 [67 P.2d 118]; *Aguilar* v. *Riverdale C.C. Assn.*, 104 Cal.App. 263 [285 P. 889].) The benefit to the possessor does not have to be a monetary one. (*Edwards* v. *Hollywood Canteen*, 27 Cal.2d 802 [167 P.2d 729]; *Oles* v. *Kahn Bros.*, 81 Cal.App. 76 [253 P. 158].)

It would appear that the state was benefited by the activities of Marine Terminals. The activities of Marine Terminals were an integral part of the functions of the Harbor Board. Clearly, the activities of Marine Terminals helped the state to carry out the statutory purpose of developing the San Francisco Harbor, and to promote the port and terminal

facilities in that area. Moreover, as already pointed out, the state collected demurrage on cargoes handled by Marine Terminals that remained on the pier over a certain length of time. Thus, the state was benefited by the presence of appellant on the pier.

But benefit to the state is not the only problem involved. Before the state can be held liable it must also appear that the state possessed such control over the place and particular instrumentality causing the injury that a duty to inspect in favor of invitees of the tenant existed. It is here that appellant has failed in his proof.

The state was not in possession of the pier, it having assigned that area to Marine Terminals. In that sense, the state was in the position of an out-of-possession landlord. ■ Generally speaking, the duty to exercise due care towards invitees is imposed only on the possessor of the property because he, rather than the title holder, is in a position to learn of hazards and to correct them. It would be unjust to put the invitor obligation on someone who could not, practically, correct the defective condition. ■ But if the landlord retains control over any portion of the leased premises he is deemed to be an invitor of invitees of the tenant as to the portion of the premises over which he retains control. (*Johnston* v. *De La Guerra Properties, Inc.*, 28 Cal.2d 394 [170 P.2d 5].) ■ Thus, a person legally can be the invitee of both the tenant and the landlord if both control the premises. (*Oles* v. *Kahn Bros.*, 81 Cal.App. 76 [253 P. 158].) ■ Ownership of the instrumentality causing the injury does not alone show control. (*Pfingst* v. *Mayer*, 93 Cal.App.2d 265 [208 P.2d 1002].) The crucial question is whether there was any substantial evidence that the state possessed control over the instrumentality that caused the injury. We find no such evidence.

Appellant argues that in three different respects the state can be found to have exercised the requisite control to impose upon it the duties of an invitor. He urges that the state had exclusive possession, management and control of the pier, and conducted a business thereon; that the situs of the injury was a "common passageway," and that, by statute, the state had control of the instrumentality involved.

The facts and the governing statutes have been set forth at some length and need not be reviewed. It is not necessary to define legally the relationship between Marine Terminals and the state. Certainly as to the pier itself and the struc-

tures on it which were assigned to Marine Terminals, the state had the statutory nondelegable duty to maintain them, and can be considered an invitor of invitees of the tenant. But here the defectively installed wire cable was not installed by the state. It was installed by Marine Terminals, the licensee of the premises. It was used by Marine Terminals to store its tarpaulins, and was under the direct control of that company. Its employees determined when and how the tarpaulins were to be stored. The state, as owner, under the statutes and its rule had the legal right to inspect, but it was not obligated to do so. It had no legal duty to tell Marine Terminals how to conduct its business. ▮▮▮ Thus, over the instrumentality of the injury, the state did not possess such control that invitees of Marine Terminals became invitees of the state. This is so even though the state be deemed to be a tenant in common with Marine Terminals of the pier.

There are several cases which are directly in point. In *McDonald* v. *Standard Gas Engine Co.*, 8 Cal.App.2d 464 [47 P.2d 777], a jury verdict against a lessor was reversed where the lessor was a tenant in common of the premises where the injury occurred. A pulley on an engine exploded, injuring an invitee of the tenant. The court held that the "record shows affirmatively that from the time . . . [the record manager of both lessor and lessee] took the pulley out of the storeroom it was in the exclusive use of the . . . [lessee]. Because the . . . [lessor] was a tenant in common did not *ipso facto* render it liable for the acts of the . . . [lessee]." (P. 471.) The court held that since the instrumentality causing the injury was under the exclusive control of the lessee, the lessor was not liable.

A case even closer in point is *McDonald* v. *Shell Oil Co.*, 44 Cal.2d 785 [285 P.2d 902]. There a nonsuit in favor of the owner was affirmed in a case where Shell hired an independent contractor by the name of Owens to work on a certain oil well. Plaintiff was an employee of Owens. Plaintiff was injured while working on certain equipment owned by Owens. This equipment was defectively rigged by Owens. Shell had the right to have, and did have, a foreman on the job at all times. Plaintiff contended that Shell exercised control over Owens and knew or should have known of the absence of a certain safety clamp. The court, in absolving Shell from liability, stated (p. 788) : "An owner is not liable for injuries resulting from defective appliances unless he has supplied them or has the privilege of selecting them or the materials

out of which they are made [citation] or unless he exercises active control over the men employed or the operations of the equipment used by the independent contractor.'' The court emphasized that Owens furnished and installed the defective rig; that the work performed when plaintiff was injured was the work Owens was hired to perform; that there were no Shell employees present at the time of the accident; that no Shell employee had knowledge of the defective condition; and that Shell at no time affirmatively assumed control of the work performed by Owens. Plaintiff also urged that Shell retained control over the work because the Shell foreman was in general charge and had the equipment under observation; that Shell also maintained a working production foreman on the job who dealt with Owens' foreman; that Shell had the authority to stop Owens if the work was unsatisfactory; that the contract between Shell and Owens gave Shell the right of inspection. The court stated (p. 790):

''However, the owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect [citation], the right to stop the work [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship.'' After discussing Shell's activities and holding that they were not sufficient to make Shell an invitor of plaintiff, the court stated that there were several situations in which the owner or landlord would be liable, as follows (p. 790):

''(1) This is not a case where the employee of the independent contractor was injured by some condition of the owner's premises over which the owner remained in control, and where the owner's duties to the employee were those owing to a business invitee [citing cases]; (2) Nor is this a case where the owner furnished the equipment or was obligated by contract to do so, and the equipment proved to be defective, causing injury to the employee of the independent contractor [citing cases]; (3) Finally, this is not a case where the owner actively interfered with or arbitrarily assumed to direct the employees of the independent contractor as to the manner and method of performing the work. [Citations.] . . .

''We conclude that the record before us shows no basis for

establishing liability on the part of defendants Shell Oil Company . . . ; and that the trial court properly granted the motion for nonsuit.''

In the instant case the evidence does not show that, either under the statutes, under the contract for the assignment of space, or under the practices adopted by the state and Marine Terminals, the state exercised the extent of control that Shell exercised in the case above discussed. The appliance causing the injury originally belonged to Marine Terminals, was installed by it, and was operated by its employees. The state had the power of general inspection, but no duty to inspect. It did not inspect. Under these circumstances there is no evidence sufficient to go to the jury on the issue.

■■■ The contention that the wire cable belonged to the state because it became a fixture requires but scant consideration. Assuming that the point can now be raised, the cable was not a fixture as a matter of law. It was not permanently attached to the realty. After it fell, it was removed by Marine Terminals and kept by it. Moreover, whether the cable was or was not a fixture, its control was in Marine Terminals.

■■■ Equally without merit is the contention that the place where appellant was injured was a ''common passageway.'' It is contended that the place where the injury occurred is comparable to the lobby of a hotel. It is also contended that the state's wharfinger business results in bringing large numbers of the ''public'' to the premises. If these facts were correct, the liability of the state as landlord would be clear. (See *Blumberg* v. *M. & T. Inc.*, 34 Cal.2d 226 [209 P.2d 1]; *Harris* v. *Joffe*, 28 Cal.2d 418 [170 P.2d 454]; *Pfingst* v. *Mayer*, 93 Cal.App.2d 265 [208 P.2d 1002]; *Foster* v. *A. P. Jacobs & Associates*, 85 Cal.App.2d 746 [193 P.2d 971]; *Dineen* v. *City & County of San Francisco*, 38 Cal.App.2d 486 [101 P.2d 736]; see annotations 97 A.L.R. 220; 75 A.L.R. 154; 58 A.L.R. 1411; 25 A.L.R. 1273.) But the facts are not as interpreted by appellant. Marine Terminals was the assignee of the space, and of all of the space on Pier 39. It was the sole occupant of the pier, including the area where the accident occurred. It paid rent for that area. The assignment of space makes no special reference to the area where the accident occurred, and neither the state nor Marine Terminals had any special rules applicable to it. Marine Terminals stored equipment and vehicles in the area as well as cargo. At times, the area was completely blocked with

cargo. The area is simply one means of ingress and egress to and from the north stringer of the pier. The tracks of the State Belt Railroad run through it. Located in the general area is a toilet, water cooler, and flight of stairs leading to a stevedore lunchroom. Various employees of Marine Terminals and of the state pass over it in the course of their work. Passengers, crews and suppliers from ships docked at the pier occasionally use it, but this is an inconvenient route. The cases above cited hold that where the landlord retains control over a portion of the leased premises he may be liable to invitees of the tenant. But the rule has no application where the area in question was not a common passageway, and was not reserved by the landlord. Except for the rights of the state in reference to the whole area assigned, Marine Terminals was the sole occupant. There is nothing to distinguish the area where the accident happened from other areas of the pier. Thus, the rule relied upon just is not applicable to the facts.

Appellant also contends that the jury should have been instructed on the so-called "public purpose" exception to the general rule of nonliability. There is no doubt that the law imposes a special duty on the landlord where the landlord knows that the rented premises are to be put to a public use. Thus, the duty applies when premises are rented for a polling place (*Boothby* v. *Town of Yreka City*, 117 Cal.App. 643 [4 P.2d 589]) ; a women's club meeting place (*King* v. *New Masonic Temple Assn.*, 51 Cal.App.2d 512 [125 P.2d 559]) ; an auto parking lot (*Burroughs* v. *Ben's Auto Park, Inc.*, 27 Cal.2d 449 [164 P.2d 897]) ; a service station (*Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375 [240 P.2d 580]) ; and a motel (*Goodman* v. *Harris*, 40 Cal.2d 254 [253 P.2d 447]). Certainly, Pier 39 was not a public place. Marine Terminals maintained a 24-hour guard on duty for the very purpose of excluding the public. But if, because passengers from freighters docking at the pier used it for ingress and egress, the pier be considered semi-public, the exception under discussion would still not be applicable. The duty on the landlord in such cases only extends to defects in the premises leased, that is, in the property leased, and not in an appliance which was brought on the premises and is owned by the tenant. That was the precise point involved in *Goodman* v. *Harris*, 40 Cal.2d 254 [253 P.2d 447], where it was held that, although a motel was a public place within the meaning of the rule, the landlord, as a matter of law,

was not liable for the death or injury of guests caused by defective gas stoves installed by the tenant and attached to the premises by pipe connections. The case is similar to the instant one. Here the cable that fell was installed and used exclusively by Marine Terminals. The defect was not in the cable but in the manner it was rigged. This rigging was done by Marine Terminals.

The exception imposing liability in the public purposes cases is based on the fact that, where there is a defect in the premises leased, it is fair and just to require the landlord to inspect, repair, and maintain the premises for the protection of the public. But in the instant case, the instrumentality causing the injury was an appliance brought on the pier and installed by Marine Terminals. As to such an appliance, the state did not have the same duty as it did towards the railroad tracks, the structures on the pier and the pier itself. As to such appliance it must be held, as a matter of law, that the state had no responsibility so far as appellant is concerned.

Appellant contends that under rule 154a adopted by the board the cable here involved became subject to the jurisdiction and control of the board, and therefore a duty to inspect was imposed. That rule provides that: ''Coal screens, donkey engines, stevedores' tools and appliances, merchandise, vehicles, or structures, must be removed from the wharves and other State property when directed by the wharfinger.'' This rule, obviously aimed at preventing obstructions on wharves and piers, imposes no duty to inspect. Certainly, the cable was not an obstruction. Undoubtedly, if the wharfinger believed or knew the cable was dangerous, he could have ordered it removed. But this power did not create a duty to inspect and maintain.

From the foregoing, it is apparent that, under the facts, as a matter of law, there was no duty to inspect and maintain the cable. Thus, it was not error to have failed to instruct on any of appellant's theories of the case.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied March 8, 1957, and appellant's petition for a hearing by the Supreme Court was denied April 2, 1957. Carter, J., was of the opinion that the petition should be granted.